[Nos. B159223, B160037, B162530. Second Dist., Div. Eight. Jan. 28, 2005.]

CITY OF SANTA MONICA, Plaintiff and Appellant, v.
MARIA STEWART as City Clerk, etc., Defendant and Respondent,
DOUGLAS HELLER et al., Intervenors and Respondents.

[No. B164794. Second Dist., Div. Eight. Jan. 28, 2005.]

RENÉ AMY, Plaintiff, v.
CITY OF PASADENA et al., Defendants, Cross-complainants and
Respondents,
PAUL MONSOUR et al., Intervenors, Cross-defendants and Appellants.

## COUNSEL

Marsha Jones Moutrie, City Attorney, Jeanette Schachtner and Anthony P. Serritella, Deputy City Attorneys, for Plaintiff and Appellant.

Rutan & Tucker, John A. Ramirez, Joel D. Kuperberg and Michael R.W. Houston for Defendant and Respondent.

Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser and Lea Rappaport Geller for Intervenors and Respondents Douglas Heller and the Foundation For Taxpayer and Consumer Rights.

Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser, Lea Rappaport Geller and Samuel G. Goldstein for Intervenors, Cross-defendants and Appellants Paul Monsour and the Foundation For Taxpayer and Consumer Rights.

Michele Beal Bagneris, City Attorney; Richards, Watson & Gershon, T. Peter Pierce and Craig S. Steele for Defendants, Cross-complainants and Respondents.

## OPINION

**BOLAND, J.—**

### SUMMARY

Lawsuits were brought relating to the enforcement of initiatives approved by voters in Santa Monica and Pasadena. The initiatives sought to prevent city officials from receiving certain advantages from persons or entities who derived benefit from discretionary decisions made by those officials. This case involves consolidated appeals challenging four separate rulings in the two actions.

■ In the Santa Monica suit, the trial court dismissed the action as a nonjusticiable controversy. We agree with that ruling. Not only does Santa Monica lack the requisite standing to challenge the constitutionality of the initiative, the claims asserted by Santa Monica are not ripe for determination.

In the Pasadena suit, the trial court denied an anti-SLAPP motion brought by the initiative's sponsor to strike Pasadena's cross-complaint, granted a summary judgment motion in favor of the city, and denied the initiative sponsor's motion for attorneys' fees under the private attorney general statute. We disagree with those rulings. The acts which led Pasadena to file a cross-complaint against the initiative sponsor arose out of protected First Amendment activities, and Pasadena was not able to demonstrate the requisite probability of success on the cross-complaint. Additionally, the perfection of the initiative sponsor's appeal from the denial of its anti-SLAPP motion divested the trial court of jurisdiction to consider Pasadena's summary judgment motion. Finally, the initiative sponsor was entitled to recover attorneys' fees under the private attorney general statute based on the necessity of its private enforcement action.

## FACTUAL AND PROCEDURAL BACKGROUND

*THE OAKS INITIATIVE:*

The Oaks Initiative (Initiative) is sponsored by the Oaks Project of the Foundation for Taxpayer and Consumer Rights (FTCR), a nonprofit organization "dedicated to training community leaders to make democracy serve ordinary people." The Initiative is premised on a conviction that public benefits frequently are awarded on the basis of personal or campaign advantages, and not on merit or in the public good. Based on the premise that such awards undermine public confidence in democratically elected institutions, the Initiative declares, "there is a compelling state interest in reducing the corrupting influence of emoluments, gifts and prospective campaign

contributions on the decisions of public officials in the management of public assets and franchises, and in the disposition of public funds." In general terms, the Initiative prohibits city officials from receiving campaign contributions, employment for compensation, or gifts or honoraria of more than $50 for a specified time after the end of their term of office from any person or entity who or which benefited financially (by more than $25,000 over a 12-month period) from the officials' discretionary decisions made while in office.

The Initiative contains four requirements:

(1) City officials who exercised their discretion to approve a "public benefit" (defined at Santa Monica initiative, § 2202, subd. (a)(1)–(7)), and Pasadena initiative § 1703, subds. (a)(1)–(7)) cannot receive certain specified "personal or campaign advantages" (defined at § 2202, subd. (c), and § 1703, subd. (c), respectively), from the recipient of such a benefit (as defined at § 2202, subd. (b), and § 1705, subd. (a), respectively.) (Santa Monica initiative § 2203, subds. (a), (b); Pasadena initiative, § 1704, subds. (a), (b).)

(2) City officials must "practice due diligence to ascertain whether or not a benefit . . . has been conferred, and to monitor personal or campaign advantages . . . so that any such qualifying advantage received is returned forthwith, and no later than ten days after its receipt." (§ 2204, subd. (a); § 1705, subd. (a), respectively.)

(3) City officials "must provide, upon inquiry by any person, the names of all entities and persons known to them who respectively qualify as public benefit recipients . . . ." (§ 2204, subd. (b); § 1705, subd. (b), respectively.)

(4) The city must provide written notice of the provisions of the Initiative and its limitations to any person or entity "applying or competing for any benefit enumerated" by the Initiative. (§ 2205; § 1706, respectively.)

Under the provisions of the Initiative, a civil action may be brought by any city resident "against a public official who receives a personal or campaign advantage in violation of" the Initiative, and a "knowing and willful violation" of the Initiative may also be prosecuted as a misdemeanor offense. (§ 2206, subds. (a)–(c); § 1701, subds. (a)–(c), respectively.)

The Initiative has been adopted, in virtually identical form and over the strenuous objections of numerous city officials, by voters in several California cities, including Santa Monica and Pasadena.[1]

---

[1] The Initiative was also enacted in Irvine, Claremont and San Francisco. Of these cities, only San Francisco has implemented the Initiative.

*THE SANTA MONICA LITIGATION:*

In November 2000, almost 60 percent of Santa Monica voters approved the Initiative (also known as proposition LL), identified as the Taxpayer Protection Amendment of 2000 (sections 2200–2207) which, as enacted, amended the city's charter.

Santa Monica officials were displeased with the Initiative's approval. City council members had campaigned vigorously against its passage, had authored the official ballot argument opposing it and, after being sued by the Initiative's proponents, ultimately were compelled by court order to include an argument in favor of the Initiative in the ballot pamphlet. The city officials had serious concerns about the constitutionality and enforceability of the Initiative. At the time, an appeal by the Southern California City of Vista from a preelection challenge to the Initiative was pending in the Fourth District Court of Appeal. In January 2001, Santa Monica received permission to join Pasadena in an amicus curiae brief filed in the Vista litigation challenging the legality of the Initiative. The three cities, also joined by Claremont, argued the Initiative was unconstitutional on its face and urged its invalidation. The Court of Appeal determined the appeal was moot because a proposition contradictory to the Initiative had passed by an even greater margin of yes votes.[2]

In May 2001, Santa Monica City Attorney, Marsha Jones Moutrie, circulated a memorandum to the Santa Monica Mayor and City Council describing

---

[2] The procedural history of the Vista litigation is significant to the arguments made here. In that case, Vista filed a preelection challenge to the legality of the Initiative. The trial court found the Initiative unconstitutional and ordered the county registrar not to place it on the November 2000 ballot. On petition by the Initiative's proponents, the Fourth District Court of Appeal immediately issued an order staying the trial court's judgment. The appellate court's order had the practical effect of allowing the Initiative to remain on the November ballot. A majority of the voters passed the Initiative. However, because a competing proposition passed by an even greater margin, the Initiative was not enacted into law. As a result, the appellate court found the cities' challenge to the validity of the Initiative was mooted by the election results, and declined the invitation of Vista and amici curiae Santa Monica, Pasadena and Claremont to exercise its discretionary authority and issue an advisory opinion on the constitutionality of the Initiative. The Court of Appeal did not merely dismiss the appeal, which would have left intact the trial court's ruling. Instead, the appellate court granted the writ of mandate requested by the proponents, vacated the trial court's ruling and judgment, and ordered the trial court to dismiss as moot Vista's challenge to the constitutionality of the Initiative.

In this case, Santa Monica and its city clerk argue that the only court to address the merits of the constitutional challenges to the Initiative deemed those challenges well founded. That assertion is incorrect. The Vista decision has been vacated and does not legally exist even as an unreported, nonbinding trial court decision. It was effectively reversed by the Court of Appeal days after it issued.

the background and purpose of the Initiative, her concerns about its constitutional validity, and the failed attempts to definitively adjudicate the Initiative's constitutionality. The city attorney reiterated her belief that the Initiative was unconstitutional, and noted she had advised the city clerk not to implement the Initiative until its constitutionality was resolved. Relying on the premise that it was "[f]aced with an initiative measure which has passed but been declared unconstitutional elsewhere," the city attorney opined that Santa Monica "could: (1) refuse to implement the measure . . . based upon the fact that a court has declared it unconstitutional; (2) implement the measure, ignoring the court decision, and thereby risk violating civil rights; (3) take no action on the measure and wait to be sued; or (4) initiate a lawsuit with the intention of obtaining a final appellate decision on the issue of constitutionality which would clarify the City's obligations." The city attorney recommended filing a lawsuit challenging the constitutionality of the Initiative.

In a status report prepared for a city council meeting two weeks later, City Clerk Maria Stewart informed members that, based primarily on the city attorney's advice, she was refusing to enforce the Initiative until its constitutionality was determined.

In June 2001, Santa Monica filed an action for declaratory relief and a petition for writ of mandate against its city clerk. The complaint alleges the existence of an actual controversy between Santa Monica and the clerk, acting in her official capacity as the official responsible for the implementation of the Initiative's provisions, regarding their respective rights and responsibilities. It alleges the clerk claims the Initiative is unconstitutional and facially invalid, and refuses to implement it. The complaint seeks a judicial declaration as to whether the Initiative "is or is not unconstitutional or otherwise illegal and unenforceable."

In July 2001, Santa Monica resident Douglas Heller, the official proponent of the Initiative in that city, and the Initiative's sponsor, the Foundation for Taxpayer and Consumer Rights (collectively FTCR), notified the trial court and counsel of their intent to intervene in the litigation solely for "the purpose of seeking its dismissal as a collusive, non-justiciable action, and as a misuse of taxpayer funds for private purposes." The court granted FTCR's request to intervene and permitted Pasadena and Claremont to participate in the action as amici curiae. Over FTCR's objection, the court scheduled a hearing and simultaneous briefing on FTCR's motion to dismiss and on the merits of Santa Monica's summary judgment motion, which addressed the legality of the Initiative.

A hearing on FTCR's motion to dismiss and the parties' dispositive motions was conducted in January 2002. In March 2002, the trial court issued an order dismissing the entire action as a nonjusticiable controversy. Santa Monica's motion for summary judgment was dismissed as moot. Judgment was entered in May 2002, from which Santa Monica appealed.

*THE PASADENA LITIGATION:*

### 1. *FTCR's anti-SLAPP motion.*

In March 2001, over 60 percent of Pasadena voters approved the Initiative, known as the City of Pasadena Taxpayer Protection Amendment of 2000, making it part of the city's charter (art. XVII, §§ 1701–1708). City officials, including City Clerk Jane Rodriguez and Mayor William Bogaard, who had aggressively campaigned against the Initiative, were as displeased with the vote as their peers in Santa Monica, but chose to take a different approach. For over a year, the City of Pasadena, Rodriguez, and Bogaard (collectively Pasadena) refused to perform the ministerial duties required by Government Code section 34460 to authenticate, certify and file copies of the Initiative with the Secretary of State, Los Angeles County Recorder, and the city's archives. Those acts were the necessary final steps before the charter amendment could officially take effect. (Gov. Code, § 34459.)

On March 15, 2002, Pasadena resident René Amy filed a petition for a writ of mandate and a complaint for declaratory and injunctive relief against Pasadena seeking to require it to authenticate and certify the Initiative and file it with the Secretary of State. Amy also filed a motion for issuance of a peremptory writ of mandate, which was scheduled for hearing. Pasadena answered the complaint, filed a cross-complaint against Amy and an opposition to Amy's motion. While acknowledging it had not complied with the provisions of Government Code section 34460, Pasadena insisted it had no duty to comply, and could not be compelled to comply, with the statute due to its belief the Initiative was unconstitutional.

Joined by Pasadena resident Paul Monsour, the official proponent of the Initiative in Pasadena, FTCR requested leave to intervene in the action on Amy's behalf. The unopposed request was granted and Monsour and FTCR filed a complaint in intervention. Monsour and FTCR asserted Pasadena had a mandatory ministerial duty to comply with the formalities of Government Code section 34460. Moreover, they asserted Pasadena's refusal to implement the Initiative and its use of public moneys to defend the action by challenging the validity of the Initiative was a wasteful and illegal expenditure of taxpayer funds which was necessary to be enjoined under Code of Civil Procedure section 526a.

Pasadena responded by filing a first amended cross-complaint for declaratory relief solely against FTCR, eliminating Amy as a cross-defendant. The pleading alleged: "An actual controversy has arisen and now exists between cross-complainants and FTCR with respect to the legal rights and duties of the Mayor and City Clerk. FTCR contends . . . that the Mayor and City Clerk must perform the duties set forth in . . . [Government Code] section 34460. Cross-complainants dispute that contention and contend that neither the Mayor nor the City Clerk has any duty to comply with the provisions of . . . section 34460, and have not yet complied with those provisions, because the Initiative to which those provisions would otherwise apply is unconstitutional and otherwise illegal on its face . . . ."

The first amended cross-complaint prayed for a judicial declaration that Pasadena had "no duty to take any of the actions set forth in . . . section 34460 with respect to the [Initiative]," because the Initiative "is unconstitutional or otherwise illegal and unenforceable."

FTCR moved to strike the first amended cross-complaint as a SLAPP suit. (Code Civ. Proc., § 425.16 [strategic lawsuit against public participation].) FTCR argued Pasadena's action against it was meritless, and arose from acts taken in furtherance of its constitutionally protected rights of petition or free speech, specifically its sponsorship of the Initiative in Pasadena, and from FTCR's audacity in joining Amy's action against Pasadena after city officials refused to perform the final steps necessary to give legal effect to the voter-enacted Initiative. FTCR also argued Pasadena's action was a nonjusticiable controversy improperly seeking an advisory opinion, and Pasadena could not establish a likelihood of prevailing on its claim against FTCR because city officials had a mandatory duty to perform their ministerial obligations under Government Code section 34460, irrespective of their views as to the constitutionality of the Initiative.

In opposition to FTCR's anti-SLAPP motion, Pasadena argued its cross-action against FTCR was not a SLAPP suit because the action was not intended to retaliate against FTCR for exercising its constitutional rights of free speech and petition. It asserted the cross-action was intended only to attack the Initiative on constitutional grounds, as to which it had shown a likelihood of prevailing. As a result, Pasadena argued FTCR could not satisfy its burden of showing the action arose from any act taken in furtherance of its rights of free speech or petition.

A hearing on May 31, 2002, addressed both Amy's petition for writ of mandate and FTCR's anti-SLAPP motion. At the conclusion of the hearing, the petition for mandate was granted on the ground Pasadena was required to comply with the ministerial requirements of section 34460, regardless of its

position as to the constitutionality of the Initiative. The mayor and city clerk were ordered to certify the Initiative, and file it with the Secretary of State, County Recorder and city archives.

However, the trial court denied FTCR's motion to strike. It found the first amended cross-complaint was not intended to punish FTCR and did not arise out of any act taken by FTCR in furtherance of its state or federal constitutional rights of free speech or petition.[3] Pasadena was instructed to prepare a proposed order, to which FTCR objected. The proposed order, in its original form, was entered by the court on June 21, 2002. Pasadena complied with the order to certify the Initiative on June 4, 2002, and it took effect two days later. On July 2, 2002, FTCR filed an appeal from the denial of its anti-SLAPP motion.[4]

### 2. Pasadena's motion for summary judgment.

On June 18, 2002, Pasadena moved for summary judgment against FTCR, arguing the Initiative was unconstitutional and preempted by state and federal law.

In its opposition to the motion, FTCR asserted the trial court lacked jurisdiction to consider the summary judgment motion because, under Code of Civil Procedure section 916, subdivision (a), its appeal from the order denying its special motion to strike stayed further proceedings on the first amended cross-complaint. FTCR requested the court to take the summary judgment motion off calendar pending the determination of the appeal.

Pasadena's reply insisted that the trial court retained the authority to address the merits of the summary judgment motion in that Code of Civil Procedure section 916 specifically authorized the court to "proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).) Because the order denying the anti-SLAPP motion did not address the merits of Pasadena's arguments regarding the validity of the Initiative, Pasadena insisted the court was free to adjudicate the constitutionality issue.

---

[3] At the hearing, the trial court indicated it also intended to base its ruling denying FTCR's motion on an additional finding that Pasadena had shown a likelihood prevailing on the merits of its cross-action. However, after FTCR pointed out that the court could not reach that issue without first determining whether the cross-action presented a justiciable controversy—an issue the court specifically declined to adjudicate—the court withdrew that ground as a basis for its ruling and found only that the cross-action had not arisen out of FTCR's exercise of any constitutionally protected activity.

[4] An order denying an anti-SLAPP motion is immediately appealable. (Code Civ. Proc., §§ 425.16, subd. (j), 904.1.)

FTCR's sur-reply reasserted that its appeal from the order denying the special motion to strike had divested the trial court of jurisdiction to consider Pasadena's motion. Based on its contention that the court lacked jurisdiction to consider the matter, neither FTCR's opposition nor its sur-reply addressed the merits of the motion for summary judgment.

FTCR's counsel appeared at the July 16, 2002 hearing on the summary judgment motion for the sole purpose of asserting again that the court lacked jurisdiction to consider the motion. The court indicated its likely agreement with that position and continued the matter for two days.

At the July 18, 2002 hearing, the trial court reversed its previous indication and ruled it was not divested of jurisdiction to proceed on the summary judgment motion. The ruling concluded the anti-SLAPP motion was denied solely because Pasadena's suit against FTCR was not intended to interfere with or punish FTCR for exercising its First Amendment rights of free speech and petition. The court found that, in denying the anti-SLAPP motion, it never reached the merits of Pasadena's constitutional arguments. Because those matters were not embraced within the pending appeal, the court concluded it was able to consider the constitutionality of the Initiative. FTCR requested a temporary stay of the proceedings to permit it to seek an extraordinary writ on the jurisdictional issue. That request was refused. The court then addressed the merits of the motion for summary judgment, and declared the Initiative unconstitutional and unenforceable in its entirety. Judgment was entered, from which FTCR appealed.

3. *FTCR's motion for attorneys' fees under the private attorney general statute.*

In October 2002, Monsour and FTCR (collectively FTCR) moved for an award of attorneys' fees and costs under the private attorney general statute, Code of Civil Procedure section 1021.5 (section 1021.5). The motion was premised on FTCR's successful prosecution of the petition for writ of mandate, which resulted in an order requiring Pasadena to comply with the provisions of Government Code section 34460.

In denying the motion for attorneys' fees and costs, the trial court found FTCR had not satisfied the requirement of section 1021.5 that the party seeking fees show "the necessity and financial burden of private enforcement . . . are such as to make an award appropriate." (§ 1021.5, subd. (b).) The court determined that, as an intervenor, FTCR had not contributed significantly to the action because (1) the court "probably would have granted" the writ petition based on Amy's arguments alone, and (2) FTCR had a "direct interest" in the implementation and enforcement of the Initiative

inasmuch as FTCR had been "actively involved in the promulgation of this particular initiative . . . and its adoption by many cities . . . ." FTCR's final appeal is from the November 25, 2002 order denying the motion for attorneys' fees and costs.

## DISCUSSION

*SANTA MONICA ACTION*

The threshold, but ultimately dispositive, question in Santa Monica's action against the city clerk is whether the action presents a justiciable controversy, which was the basis for the trial court's dismissal.

■ A declaratory relief action may be brought under Code of Civil Procedure section 1060: "Any person . . . who desires a declaration of his or her rights or duties with respect to another, . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . in the superior court for a declaration of his or her rights and duties . . . including a determination of any question of construction or validity arising under the instrument or contract. . . . The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." However, "[t]he court may refuse to exercise [its] power [to] grant[] [declaratory relief] in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." (Code Civ. Proc., § 1061.)

Before turning to the merits, we address the disputed issue of the appropriate standard of review. Santa Monica insists the standard of review from the trial court's judgment dismissing this declaratory relief action is de novo, because the appeal involves purely legal questions, including the question of whether the action presents a justiciable controversy. There is support for this position. (See, e.g., *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974 [97 Cal.Rptr.2d 280] [if underlying facts are undisputed, trial court's decision to grant or deny declaratory relief presents a question of law, reviewed de novo].)

FTCR, on the other hand, relies on the long-standing rule that the decision whether to grant or deny declaratory relief is a matter within the trial court's discretion, and will not be disturbed on appeal absent a clear showing the discretion was abused, particularly where the court's ruling is based, in part, on factual determinations. (*City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (2003) 113 Cal.App.4th 465, 481 [6 Cal.Rptr.3d 367] (*City of Burbank*); *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 893 [72 Cal.Rptr.2d 73] [A determination regarding the

justiciability of an action under Code Civ. Proc., § 1060 "is . . . a matter entrusted to the sound discretion of the trial court."]; *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 23 [61 Cal.Rptr. 618] (*California Water & Telephone Co.*); *Bixby v. Bixby* (1953) 120 Cal.App.2d 495, 499 [261 P.2d 286] [absent a showing of the abuse of discretion, trial court findings which appear to be based upon a reasonable analysis of the facts and circumstances will not be disturbed on appeal].) We need not resolve this interesting dispute. The trial court's ruling is correct under either standard. We turn to the dispositive question of the justiciability of this action.

■ "The concept of justiciability involves the intertwined criteria of ripeness and standing." (*California Water & Telephone Co., supra,* 253 Cal.App.2d at p. 22.) "Standing" derives from the principle that "[e]very action must be prosecuted in the name of the real party in interest . . . ." (Code Civ. Proc, § 367.) A party lacks standing if it does not have an actual and substantial interest in, or would not be benefited or harmed by, the ultimate outcome of an action. (*California Water & Telephone Co., supra,* 253 Cal.App.2d at p. 23; *Sherwyn v. Department of Social Services* (1985) 173 Cal.App.3d 52, 58 [218 Cal.Rptr. 778] (*Sherwyn*).) Standing is a function not just of a party's stake in a case, but the degree of vigor or intensity with which the party presents its arguments. (*Harman v. City and County of San Francisco* (1972) 7 Cal.3d 150, 159 [101 Cal.Rptr. 880, 496 P.2d 1248] (*Harman*); *Fiske v. Gillespie* (1988) 200 Cal.App.3d 1243, 1247 [246 Cal.Rptr. 552] (*Fiske*).) "Ripeness" refers to the requirements of a current controversy. According to the Supreme Court, "an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law . . . will not be entertained." (*Golden Gate Bridge etc. Dist. v. Felt* (1931) 214 Cal. 308, 316 [5 P.2d 585] (*Golden Gate*).) A controversy becomes "ripe" once it reaches, "but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made." (*California Water & Telephone Co., supra,* 253 Cal.App.2d at p. 22, fn. omitted.)

The trial court correctly concluded this action fails both the standing and ripeness aspects of the test of justiciability.

A. *The Santa Monica action is not justiciable.*

 1. *Santa Monica is not a proper plaintiff, and no legitimate basis justifies a departure from the general rules governing standing.*

■ Generally speaking, "[e]very action must be prosecuted in the name of the real party in interest . . . ." (Code Civ. Proc., § 367.) Only the real

party in interest has "an actual and substantial interest in the subject matter of the action," and stands to be "benefited or injured" by a judgment in the action. (*Friendly Village Community Assn., Inc. v. Silva & Hill Co.* (1973) 31 Cal.App.3d 220, 225 [107 Cal.Rptr. 123].) In other words, a person who invokes the judicial process lacks " 'standing' if he, or those whom he properly represents, does not have a real interest in the ultimate adjudication because the actor has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented." (*California Water & Telephone Co., supra,* 253 Cal.App.2d at pp. 22–23, fn. omitted.) Standing is measured not just by a plaintiff's stake in the resolution of an action, but by the force with which it presents its case. As stated in *Harman, supra,* 7 Cal.3d at page 159: "A party enjoys standing to bring his complaint into court if his stake in the resolution of that complaint assumes the proportions necessary to ensure that he will vigorously present his case. [Citation.] . . . [W]e must determine standing by a measure of the 'intensity of the plaintiff's claim to justice.' [Citation.]"

Under traditional standing principles, Santa Monica, which bears minimal responsibilities under the Initiative,[5] lacks direct standing to prosecute this action. The complaint does not specify any actual or threatened action which would injure the city or violate its rights. Rather, the complaint alleges only that Santa Monica is concerned that implementation of the Initiative might prospectively affect the rights of its volunteer and paid public officials. Santa Monica also does not allege any actual or threatened action on the part of the city clerk—who bears no specific duties under the Initiative—which injures or could injure the city.[6] Finally, in light of Santa Monica's steadfast opposition to the enactment and implementation of the Initiative, the tepid nature of its allegations seeking to enforce the measure and seeking a judicial declaration as to whether the Initiative "is or is not unconstitutional," and its limited arguments in support of the Initiative, we have significant doubt Santa Monica is a "party with a true incentive . . . to present arguments supporting [the Initiative's] validity." (*Fiske, supra,* 200 Cal.App.3d at p. 1247.)

---

[5] The Initiative imposes on Santa Monica only the affirmative obligation to inform prospective contractors of the terms and limitations of the Initiative. (Initiative, § 2205.)

[6] The city clerk has certain record-keeping requirements independent of the Initiative, which include the receipt and review of campaign disclosure statements. (Gov. Code, § 84215; Cal. Code Regs., tit. 2, § 18110.) However, as the clerk concedes, those mandated duties do not include the duty to ensure the disclosure statements comply with the Initiative, nor the duty to file an enforcement action against an offending public official if they do not. We agree with the trial court's assessment that the clerk's role with regard to the implementation of the Initiative is so remote she has no legitimate role to perform in this action. There is simply no danger the clerk's fear she will "violate individuals' civil rights" will be realized.

The city clerk asserts that standing requirements are not absolute. Standing rules are sometimes relaxed in cases involving challenges to the constitutionality of a statute brought by a party whose own rights are not impacted, but whose challenge is raised on behalf of absent third parties. Two intertwined factors must be examined to determine whether relaxation of the general rules is appropriate. First, the relationship between the litigant and the absent third party whose rights the litigant asserts must be so close that the litigant "is fully, or very nearly, as effective a proponent of the right as" would be the absent party. (*Singleton v. Wulff* (1976) 428 U.S. 106, 114–116 [49 L.Ed.2d 826, 96 S.Ct. 2868]; *Selinger v. City Council* (1989) 216 Cal.App.3d 259, 270–271 [264 Cal.Rptr. 499] (*Selinger*).) Second, the ability of the absent party to assert his own rights must be determined. Even where the relationship between the litigant and third party is close, some "genuine obstacle" must prevent the absent party from asserting his or her own interests. (*Singleton v. Wulff, supra,* 428 U.S. at pp. 114–116; *Selinger, supra,* 216 Cal.App.3d at pp. 270–271.)

*Selinger* illustrates a circumstance where relaxation of traditional standing principles is appropriate. It involved a city council's challenge to the constitutionality of a statute that provided for approval of land use and development permits by operation of law if a public entity failed to act within a specified period, but which did not provide for notice to adjacent property owners whose interests were potentially affected by the approval. The potentially affected property owners were not parties to the suit. The court rejected the argument the city lacked standing to challenge the statute. Because the rights of third party citizens were "inextricably bound up" with the city's duty to review and approve the permits, the court found the city had standing to challenge the absence of a notice provision in the statute. (*Selinger, supra,* 216 Cal.App.3d at p. 271.) "More important[ly]," the court also found that "genuine obstacles" prevented the absent property owners from asserting their own rights. Specifically, the statute afforded affected property owners only 90 days to challenge permit approvals. The shortened statutory time period, coupled with the absence of any provision for notice, meant that potentially impacted homeowners were unlikely to learn of their right to challenge the approval until after the expiration of the period for a challenge. Thus, the court found the city had standing to challenge the notice issue on behalf of the absent owners. (*Ibid.*)

The circumstances of this case are dissimilar from *Selinger*, and the authorities on which the city clerk relies do not advance her argument. In the other cases cited, absent third parties faced the risk of civil or criminal penalties in order to mount their own First Amendment challenges to the statute. (See *People v. Fogelson* (1978) 21 Cal.3d 158, 162–163, fn. 3, 164 [145 Cal.Rptr. 542, 577 P.2d 677] [party may mount facial challenge to constitutionality of ordinance requiring permit to solicit at airport, even

though he never attempted to comply with permit requirement: " ' "Standing is recognized in such a situation because of the dangers inherent in tolerating, in the realm of the First Amendment, the existence of a penal statute susceptible of sweeping and improper application . . ." ' [citation.]"]; *In re Andre P.* (1991) 226 Cal.App.3d 1164, 1171–1172 [277 Cal.Rptr. 363] [litigant mounting First Amendment "overbreadth" challenge to governmental speech restrictions need not show his own conduct could not be regulated by statute; litigant has standing to challenge statute not because his own rights of expression are violated, but because of potential that the regulation's very existence may "chill" the constitutionally protected right of speech or expression of other parties not before the court]; cf. *Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013, 1019–1021, 1027, 1032 [2 Cal.Rptr.2d 648] [granting city declaratory relief in facial challenge to initiative which proposed to enact an unconstitutionally discriminatory regulatory scheme affecting the equal protection and due process rights of homosexuals or persons with AIDS, even though challenge was mounted only by city council, no member of which faced criminal or civil penalty for prohibited vote].)

The authorities do not support the city clerk's contention that courts "routinely adjudicate challenges to statutes on First Amendment grounds even where the particular constitutional deficiency of the statute may not affect the person making the challenge." While each case cited involved potential penalties or prosecution, this case does not. Nor does the record indicate any city official potentially impacted by the Initiative faces the risk of civil or criminal penalties in mounting a challenge to the constitutionality of the enactment.

We agree with the trial court. Even if Santa Monica—which vigorously opposed enactment of the Initiative and has challenged its constitutionality at every opportunity—could be as effective a proponent of the First Amendment rights as its absent public officials would be, no "genuine obstacle" prevents an absent public official from mounting a challenge to the constitutionality of the measure. In the absence of such an obstacle, no basis exists for the city's assertion of absent third parties' purported interests.

Finally, Santa Monica and the city clerk assert that FTCR's intervention obviated concerns about the justiciability of this action. We do not agree. First, Santa Monica and the clerk ignore the fact that FTCR sought to intervene solely to dismiss the action as a nonjusticiable controversy. Although FTCR opposed Santa Monica's summary judgment motion which defended the legality of the Initiative, its opposition was submitted over its

objection and only because the trial court ordered it to do so.[7] More fundamentally, even if FTCR's participation in the action on the merits obviates the problem of standing, Santa Monica has not overcome the impediment to adjudication of the related, and equally important, problem of ripeness.[8]

### 2. *Santa Monica's claims are not ripe.*

■ A controversy "ripens" once it has reached, "but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made." (*California Water & Telephone Co., supra,* 253 Cal.App.2d at p. 22.) Ripeness is aimed at "prevent[ing] courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of . . . opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable

---

[7] By the time FTCR learned of this proceeding and sought leave to intervene to dismiss the action, Santa Monica and the city clerk had already agreed on a briefing schedule for Santa Monica's anticipated motion for summary judgment. Santa Monica and the clerk objected to delaying the hearing only to give FTCR an opportunity to act as a "suicide bomber" and "blow up the lawsuit." In response, FTCR objected to the requirement that it brief the complex constitutional arguments before the trial court determined whether the action could proceed. The court delayed the hearing on the summary judgment motion and, over FTCR's objection, ordered the parties simultaneously to brief the justiciability of the city's action and the substantive merits of the motions, and set the motions for a consolidated hearing. The court granted FTCR leave to intervene and ordered it to file a complaint-in-intervention, requiring that the complaint include allegations as to the constitutionality of the Initiative and not just the justiciability of the action, in the event the motion to dismiss was denied and FTCR chose to continue to participate in the action on the merits.

[8] Santa Monica and the city clerk rely on Division Seven's recent opinion in *City of Burbank, supra,* 113 Cal.App.4th 465, to support the contention that FTCR's presence as an intervenor, in and of itself, eliminates the standing issue. The circumstances in *City of Burbank* differ markedly from this case. First, in *City of Burbank,* the airport authority's standing was not at issue. Here, the clerk is a nominal defendant purportedly sued over her refusal to perform duties she does not have, by a plaintiff with no standing of its own who seeks only to assert the rights of absent third parties. Second, the proponent of the ballot measure in *City of Burbank* agreed, at the city's invitation, to intervene in the action on the merits to challenge the plaintiff's claims of illegality and to seek a declaration that the ballot measure was constitutional and enforceable. (*Id.* at p. 471.) Here, FTCR sought to intervene for the sole purpose of dismissing the action on the ground the court lacked subject matter jurisdiction, an intervention opposed on that basis by both Santa Monica and the clerk. FTCR was forced to mount a defense of the Initiative on the merits only because the court denied its request to conduct a separate proceeding on nonjusticiability arguments before it addressed the constitutionality of the measure.

the court to make a decree finally disposing of the controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] (*Pacific Legal Foundation*).)

A two-pronged test is used to determine the ripeness of a controversy: (1) whether the dispute is sufficiently concrete so that declaratory relief is appropriate; and (2) whether the parties will suffer hardship if judicial consideration is withheld. (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 501–502 [74 Cal.Rptr.2d 75] (*Farm Sanctuary, Inc.*).) "Under the first prong, the courts will decline to adjudicate a dispute if 'the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a 'contrived inquiry [citation].' Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay." (*Id.* at p. 502.)

This action fails both prongs of the ripeness test. First, the declaratory relief action, by which Santa Monica seeks "the benefit" of judicial guidance "as to the constitutionality of the Initiative," is insufficiently concrete and fails to touch the legal relations of parties with actual adverse legal interests. (See *Pacific Legal Foundation, supra,* 33 Cal.3d at pp. 170–171.)

The Initiative's requirements and restrictions are directed only at "elected or appointed public official[s] acting in an official capacity," who are vested with the discretion to approve public benefits. (Initiative, §§ 2202, subd. (d), 2203, subd. (a).) It is only those public officials who are constrained by the Initiative's requirements and restrictions as to receipt of "personal or campaign advantages." Those city officials (1) are prohibited from receiving specified "personal or campaign advantages" from one on whom a public benefit has been conferred; (2) must engage in due diligence to determine whether a public benefit has been conferred, and to monitor personal or campaign advantages so that improper "advantages" may timely be returned; and (3) must "provide, upon inquiry . . . , the names of all entities and persons known to them who respectively qualify as public benefit recipients . . . ." (Initiative, §§ 2203, subd. (a), 2204, subds. (a), (b).) Moreover, only those enumerated public officials who receive personal or campaign advantages, and not the city or its clerk, risk enforcement of the Initiative through civil or criminal proceedings brought against them. (Initiative, § 2206.) Indeed, only one minor provision, requiring notification of the Initiative's terms and provisions to prospective contractors, is directed at the city. (Initiative, § 2205.)

The city clerk insists the Initiative is unconstitutional and, because she is concerned about infringing upon the constitutional rights of persons or

entities who would be affected by the Initiative, refuses to implement its provisions until the constitutional issues are resolved. However, as the trial court correctly concluded, no showing has been made that the clerk "has any remaining duties or obligations under the Initiative such that her asserted 'refusal' to implement the Initiative has any legal effect sufficient to support this action."[9] As Santa Monica's designated "elections officer," the clerk receives campaign disclosure statements for review to ensure they "conform on their face with the requirements of the Political Reform Act." (Cal. Code Regs., tit. 2, § 18110; see Gov. Code, § 84215.) However, neither these ministerial duties nor the Initiative charges the clerk with the responsibility to ensure the disclosure statements comply with the Initiative, much less bring an action to enforce its requirements, should she suspect a violation. Based on these limited facts, we agree with the trial court that no danger is presented that the clerk will be forced to "violate individuals' civil rights" simply by receiving campaign disclosure statements for filing under the Political Reform Act.[10] In sum, this controversy has not yet reached the point where it is " 'definite and concrete, touching the legal relations of parties having adverse interests.' " (*Pacific Legal Foundation, supra,* 33 Cal.3d at pp. 170–171, citation omitted.)

The action also fails the second prong of the ripeness test. No showing has been made that the withholding of a judicial determination will result in an imminent, significant hardship. Santa Monica and at least two other cities have attempted to judicially resolve the issue of the Initiative's constitutionality since late 2000, when they participated as an amicus curiae in the *Vista* appeal.[11] However, Santa Monica's dogged pursuit of litigation "to eliminate the lingering uncertainty that has existed and continues to exist concerning

---

[9] The city clerk's only actual "duties" (under Government Code sections 34459 and 34460)—to certify and send the election returns to the Secretary of State for filing, so that the Initiative could be adopted as an amendment to the Santa Monica Charter—were performed long ago.

[10] Santa Monica also asserts the city clerk has two additional duties under the Initiative. Those assertions are not supported by the record. First, Santa Monica's representation to the contrary notwithstanding, the Initiative does not require the clerk to inform prospective bidders of the Initiative's restrictions. That duty rests with the city itself. (Initiative, § 2205.) Moreover, even if that duty is assigned to the clerk, we are unable to see how the clerk would "violate individuals' civil rights" merely by providing notice of the terms of the Initiative. Second, Santa Monica argues section 2204 of the Initiative effectively requires the clerk to produce, "in writing," the names of the recipients of public benefits and public records "immediately" upon request. However, the text of the Initiative is at odds with this assertion. First, logic dictates that this section applies in the first instance not to the clerk, but to those public officials vested with the discretion to confer public benefits, and thus subject to the stated penalties. Second, the text does not require that disclosures must be made either immediately or in writing. (Initiative, § 2204, subd. (b).)

[11] FTCR insists that Santa Monica began attempting to thwart the Initiative at an earlier date when city council members campaigned aggressively against the Initiative and authored the official ballot argument in opposition to the measure.

the constitutional validity of the Initiative" is not sufficient to give rise to an actual justiciable controversy. It is not sufficient that the issues encompassed by the Initiative involve a sizeable public interest. As the trial court concluded, "[w]ithout proper grounds for justiciability, the court would be rendering an improper advisory opinion," which that court declined to do, as do we. Even if Santa Monica and the city clerk—or the clerk and FTCR—fundamentally disagree as to the constitutionality of the Initiative, no justiciable conflict exists. " 'A difference of opinion does not give rise to a justiciable case until an actual controversy arises.' " (*Wilson v. Transit Authority* (1962) 199 Cal.App.2d 716, 722 [19 Cal.Rptr. 59] (*Wilson*).)

## B. *This is not an appropriate "validation action."*

Implicitly acknowledging this action fails to satisfy the traditional tests for ripeness and standing, Santa Monica and the city clerk insist we should nevertheless reach the merits of their constitutional arguments as a common law "validation action," under *Golden Gate, supra,* 214 Cal. 308, and *City and County of S.F. v. Boyd* (1943) 22 Cal.2d 685 [140 P.2d 666] (*Boyd*), and their progeny.[12] Again, we disagree.

■ Even validation actions are not exempt from the traditional principle that a justiciable action must satisfy the requirements of both ripeness and standing. "It is, of course, the prevailing doctrine in our judicial system that an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law, is collusive and will not be entertained; and the same is true of a suit the sole object of which is to settle rights of third persons who are not parties." (*Golden Gate, supra,* 214 Cal. at p. 316; accord, *Boyd, supra,* 22 Cal.2d at pp. 693–694.) As the trial court observed, the cases on which Santa Monica and the city clerk rely involved a justiciable dispute between parties directly affected by a public entity's proposed action, or were based on an actual duty

---

[12] A validation action is brought on either a statutory or, historically, on a common law basis. Generally speaking, statutory validation actions are designed to provide expedient, uniform procedures by which public agencies can obtain binding judgments as to the validity of public financing commitments such as "bonds, warrants, contracts, obligations or evidence of indebtedness pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." (Gov. Code, § 53511; see *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843 [73 Cal.Rptr.2d 427] [a validation action is a lawsuit filed for the purpose of securing a judgment determining the validity of a particular public agency's action or decision]; *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 340–341 [85 Cal.Rptr. 149, 466 P.2d 693]; *N.T. Hill Inc. v. City of Fresno* (1999) 72 Cal.App.4th 977, 991 [85 Cal.Rptr.2d 562].) The instant action, which involves no financial commitment by Santa Monica, is not of the sort contemplated by the validation statutes.

owed by a public official whose refusal to perform was legally impeding the ability of the public entity to fulfill its functions. This is not such a case.

In *Golden Gate,* a bridge and highway district sought to compel the secretary of the district's board of directors to execute bonds to raise funds for highway and bridge construction. The secretary's signature on the bonds was required by statute for the bonds to properly issue and become operative. (*Golden Gate*, *supra,* 214 Cal. at p. 316.) The secretary refused to sign the bonds based on his belief that the statutory grant of authority to the district to levy and collect a direct annual tax to pay off the bonds was unconstitutional. He also believed that, if he signed the bonds, "he would be acting in violation of his public duty, and assisting in the deception of prospective purchasers of the bonds . . . a step which might conceivably involve a personal liability on his part," in the event his belief about the unconstitutionality of the act was ultimately deemed correct. (*Id.* at p. 317.) Under those circumstances, the Supreme Court held, "[a] genuine controversy existed . . . between petitioner and respondent as to matters vitally affecting the duties and perhaps the liabilities of the latter." (*Ibid.*)

In *Boyd,* a taxpayer sued a city controller to enjoin payment of certain wages to employees of the municipal railway, claiming their compensation exceeded the rates authorized by the city's wage laws. (*Boyd, supra,* 22 Cal.2d at p. 693.) Due to the pendency of that action, the controller refused to approve the railway employees' wage claims. The city and its public utilities commission sought a writ of mandate to compel the controller to make the payments. The Supreme Court found the controversy justiciable, not just a collusive suit filed to determine a point of law or to settle the rights of absent third parties. The court held the controller "would be acting in violation of his public duty if he authorized payment of claims that involved an illegal expenditure of public funds." (*Id.* at p. 694.) His ability to approve the wage payment claims depended upon the validity of the ordinances authorizing the compensation, and resolution of that question required construing the city charter and applying its provisions in light of the facts of the case. Because the taxpayer's action challenged the controller's right to approve the payments, a real controversy was found to exist with regard to his duties. (*Ibid.*)

The other validation actions on which Santa Monica and the city clerk rely involve factual contexts in which actions were instituted against similarly recalcitrant public officials whose actions were essential to implementing the laws or financial transactions. (See *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 228 [45 Cal.Rptr.2d 207, 902 P.2d 225] [bonds could not issue because auditor-controller refused to sign them]; *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 477 [91 Cal.Rptr. 23, 476 P.2d 423] [city sued city manager and clerk to compel them to

perform ministerial duties essential to the city's ability to perform contractual agreements with third parties].) Neither action was brought solely for the abstract purpose of determining whether the bonds or contracts were valid. Rather, they were instituted to prove the bonds or agreements were valid and to obtain conclusive judicial determinations that they should issue and/or be enforced.[13] By contrast, the tepid allegations of Santa Monica's complaint do not contend that the Initiative is valid; the complaint seeks only a determination regarding its validity. Moreover, unlike the cases on which Santa Monica and the clerk rely, the clerk's personal belief regarding the Initiative's unconstitutionality, however genuine, has no bearing on its enforcement, and she has not taken any act to prevent or obstruct the city's ability to implement the Initiative.[14]

---

[13] In the recent case of *Lockyer v. City & County of San Francisco* (2004) 33 Cal.4th 1055 [17 Cal.Rptr.3d 225, 95 P.3d 459], the Supreme Court made it quite clear that validation actions, in which courts have found that a local executive public official may refuse to comply with a ministerial statutory duty if he or she believes the statute imposing the duty to be unconstitutional, are limited to truly exceptional and narrow circumstances, not present here. Discussing a series of public finance actions, the Court noted the public officials involved in those actions were permitted to refuse to perform their statutory duties when they had doubts about the validity of an underlying bond, contract or public expenditure, and thereby institute or instigate judicial actions, only where (1) the public official's refusal to perform his or her duty ensured that a mechanism was available for obtaining a timely judicial determination of the validity of the bond or contract, etc.—a determination often essential to the bond's marketability, a contracting party's willingness to perform under its contract, or to prevent an irreparable loss of public funds; and (2) the public official himself or herself frequently faced personal liability. (*Id.* at pp. 1096–1097, and fn. 25.)

[14] The city clerk also relies heavily on *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158 [143 Cal.Rptr. 633], a case which is inapposite. There, Berkeley and the city's Redevelopment Agency (BRA) adopted a redevelopment plan prohibiting residential housing in an industrial zone. After lobbying unsuccessfully to save homes within the area, a residents' group sponsored an initiative toward that end, which the voters approved. (*Id.* at pp. 162–163.) After the election, BRA sued Berkeley for declaratory and injunctive relief. The dispute concerned whether the subject of the initiative was legislative and thus a proper use of the initiative process, or an exercise of the BRA's administrative powers which were not subject to referendum. (*Id.* at pp. 167–169.) The residents intervened to defend the initiative. Shortly thereafter, the BRA ceased to exist and its powers were re-vested in the city council. (*Id.* at pp. 164–166.) The residents asserted the case was not justiciable and should be dismissed because the merger of Berkeley and BRA aligned their interests and eliminated any true legal controversy between them. The court rejected that contention. An actual controversy was found to exist because the residents intervened while BRA was still "an actual and legal party to the action with interest [*sic*] adverse to those of the . . . City of Berkeley." (*Id.* at p. 165.) In addition, unlike this action, the initiative in *Redevelopment Agency v. City of Berkeley* imposed significant affirmative obligations on Berkeley to grant use permits to all nonconforming existing uses within the project area, prepare an environmental impact report, and issue specific employment opportunity notices and annual reports to voters. (*Id.* at p. 164.)

Santa Monica and the city clerk also urge us to find the existence of a justiciable validation action based on dicta in *City of Burbank, supra,* 113 Cal.App.4th 465, in which intervention in the action by a principal proponent of an initiative was determined to provide the requisite degree of adversity in an otherwise "friendly suit." (*Id.* at pp. 481–482.) As discussed, the

In sum, this action presents no actual controversy necessitating judicial intervention. Accordingly, any decision on the merits would leave this court in the role of issuing an improper advisory opinion in a case involving a contrived dispute in which "there is virtually but one party." (*People v. Pratt* (1866) 30 Cal. 223, 225.) We agree with FTCR: "Permitting the validity of a voter-enacted initiative to be determined in a lawsuit in which both parties and their attorneys not only believe, but have affirmatively stated in prior judicial proceedings, that the measure is unconstitutional makes a mockery of 'one of the most precious rights of our democratic process' (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473]) and breeds disrespect for the integrity of the judicial process." This case, filed by Santa Monica to secure a legal determination or to settle the rights of absent third parties, is precisely the type of case the Supreme Court admonished "will not be entertained." (*Golden Gate, supra,* 214 Cal. at p. 316; *Boyd, supra,* 22 Cal.2d at p. 694.)

C. *An otherwise nonjusticiable action may not be entertained simply because it involves issues of public concern.*

Explicitly acknowledging the long-standing principle that courts typically will not address issues unnecessary to the disposition of an appeal, Santa Monica and the city clerk nevertheless urge us to resolve the issue of the constitutionality of the Initiative because of its public import. We decline to do so.

■ We may not disregard the long-standing principle that, even in circumstances when an issue involves significant public interest, California courts adhere to the even older, and more important, judicial policy against issuing advisory opinions. "[N]either we nor the trial court can give advisory opinions or resolve disputes over matters which involve parties not before us even if the parties are united in their desire to have the court resolve unripe issues or claims which the parties have no standing to assert." (*Korean*

---

circumstances of that case differed markedly from this case. Indeed, like the referendum in *Redevelopment Agency v. City of Berkeley,* but unlike the Initiative here, the initiative involved in *City of Burbank* imposed significant responsibilities on the city itself. The court found that if Burbank enforced the initiative and refused to issue permits for proposed airport projects until the Airport Authority complied with the initiative's onerous requirements, it would certainly be sued by the Airport Authority. On the other hand, if Burbank, consistent with its view that the initiative was constitutionally infirm, refused to implement the initiative, it would have been sued—as it was—by the initiative's proponents. (*Id.* at p. 481.) Unlike this case, in which Santa Monica had only the minimal obligation to notify prospective contractors of the Initiative's terms, Burbank had standing because its own numerous rights and obligations as a city were adversely affected by implementation of the ballot measure. The cases are also distinct from one another in that the intervenor in *City of Burbank* willingly agreed to participate on the merits. Here, FTCR intervened solely for the purpose of seeking dismissal of a nonjusticiable, and arguably collusive, action.

*Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069, 1081 [92 Cal.Rptr.2d 275].) This policy is driven largely by a recognition that courts are unable properly to adjudicate issues when only hypothetical facts are involved.[15] (See *Pacific Legal Foundation, supra,* 33 Cal.3d at p. 170.) That very concern exists here. As the trial court correctly found, "the mere fact that the subject matter of the Initiative touches upon issue [*sic*] of genuine public concern does not obviate the need for a proper showing of both standing and ripeness."

We recognize the constitutional questions posed by Santa Monica and the city clerk undoubtedly are of significant interest and continuing public import. As both the City and its clerk point out, significant substantive issues remain and must, at some point, be addressed on their merits. Those issues include such important constitutional questions as whether, as the clerk contends, the Initiative is invalid because it discriminates in favor of those who oppose specified city projects, even if they do so for self-interested or competitive reasons, whether the Initiative is unconstitutionally underinclusive with respect to its proscriptions against those who receive certain public benefits, but impermissibly sweeping with regard to its allegedly overbroad bans on contributions and employment. Strong public policy and public interest principles are at stake, issues which are of great interest to the parties to the litigation and the public at large. That is not enough. It is wholly inappropriate to resolve those abstract issues in the absence of evidence regarding the existence of an actual controversy or the ripening seeds of one. Courts are not free to render advisory opinions regarding controversies which the parties fear will arise, but which do not presently exist.

## PASADENA ACTION

### A. *The anti-SLAPP motion.*

At issue in this portion of the consolidated appeals is whether the trial court erred in denying FTCR's anti-SLAPP motion.[16] (Code Civ. Proc., § 425.16 (hereafter section 425.16 or the "anti-SLAPP statute")).) The anti-SLAPP statute reflects the Legislature's intention to curb meritless "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) To address that concern, the statute provides that a "cause of action against a person arising from any act of that person in furtherance of

---

[15] To a slightly lesser extent, the policy also recognizes that parties seeking advisory opinions often attempt to manipulate the legal process for their own purposes. (See *Fiske, supra,* 200 Cal.App.3d 1243.)

[16] As noted, "SLAPP" is the acronym for strategic lawsuits against public participation. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*).)

the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)[17]

██ The trial court is required to engage in a two-step process to resolve an anti-SLAPP motion. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).)" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*).) Second, if "the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Ibid.*) The moving party bears the burden on the first issue; the responding party on the second. (*Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141, 151 [106 Cal.Rptr.2d 843] (*Shekhter*).) "Only a cause of action that satisfies both prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier, supra,* 29 Cal.4th at p. 89, italics omitted.) The trial court's rulings on both issues are reviewed de novo. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928 [116 Cal.Rptr.2d 187].)

1. *The acts which led to filing the first amended cross-complaint against FTCR arose out of FTCR's protected First Amendment activities.*

The threshold issue in ruling on an anti-SLAPP motion is whether "the challenged cause of action is one arising from protected activity." (*Equilon, supra,* 29 Cal.4th at p. 67.) The trial court agreed with Pasadena and ruled that FTCR's motion foundered on this first prong because Pasadena's cross-action was not motivated by a desire to punish FTCR or chill the exercise of

---

[17] Under section 425.16 an "act . . . in furtherance" of a person's right of petition or free speech is defined as: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e).)

its First Amendment rights. Rather, the goal was only to obtain a judicial determination that the city was not required to perform any of the ministerial duties necessary to certify the election results required by Government Code section 34460 because the Initiative was unconstitutional.

The trial court misconstrued the law. In *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728 [3 Cal.Rptr.3d 636, 74 P.3d 737], the Supreme Court reiterated the controlling principles: "In *Briggs v. Eden Council for Hope and Opportunity* (1999) 19 Cal.4th 1106 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*), when first construing the 'arising from' prong of section 425.16, we held on the basis of the statute's plain language that a defendant moving specially to strike a cause of action arising from a statement or writing made in connection with an issue under consideration in a legally authorized official proceeding need not separately demonstrate that the statement or writing concerns an issue of public significance. (*Briggs, supra,* at p. 1109.) And in a trio of opinions issued [in 2002], we held that the plain language of the 'arising from' prong encompasses any action based on protected speech or petitioning activity as defined in the statute (*Navellier, [supra,]* 29 Cal.4th [at pp. 89–95] . . . rejecting proposals that we judicially engraft the statute with requirements that defendants moving thereunder also prove the suit was intended to chill their speech (*Equilon, supra,* 29 Cal.4th at p. 58) or actually had that effect (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75 [124 Cal.Rptr.2d 519, 52 P.3d 695] [(*Cotati*)].)" (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at pp. 733–734.) The trial court mistakenly relied on the absence of evidence that Pasadena meant to chill FTCR's exercise of its First Amendment rights as the ground for denying the anti-SLAPP motion.

Regardless of the mistaken rationale for the trial court's ruling, we must exercise our independent review to determine whether the ruling was correct. We must determine whether Pasadena's cross-action against FTCR arose out of FTCR's actions in furtherance of the right of free speech or petition. (*Navellier, supra,* 29 Cal.4th at pp. 89–95.) Conceding "[t]here is no easy answer to that question," Pasadena asserts that two "acts" led it to file its cross-complaint, neither of which was intended to advance any person's right of free speech or petition in connection with a public issue. Those acts were: "(1) the approval of the initiative by the voters; and (2) the initiative measure becoming law." We conclude otherwise.

Turning first to the latter point, Pasadena's cross-action against FTCR could not have arisen from the "Initiative becoming law." The Initiative did not become law until after the cross-action was filed, and only after the trial court found no merit in Pasadena's assertion it had "no duty to take any of the actions set forth in Government Code section 34460 with respect to the

[Initiative]." FTCR is correct: "[T]he gravamen of [Pasadena's] Cross-Complaint was a request for a judicial declaration that [Pasadena] had no duty to perform precisely those acts that were necessary *in order for the Oaks Initiative to become law*. The First Amended Cross-Complaint thus tried to *prevent* the Oaks Initiative from becoming law; it did not 'arise from' the initiative measure becoming law."

 Second, even if we agreed that the act which led to the filing of the cross-complaint against FTCR was the voters' approval of the FTCR-sponsored Initiative, that approval would represent, among other things, a paradigmatic exercise of FTCR's and the voters' engagement in "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see also *id.*, subd. (e)(2) [covered acts include statements made in connection with an issue under consideration by a legislative body, or other legally authorized proceeding].) Advocacy for an Initiative and adoption of the measure are, without question, a fundamental exercise of the First Amendment right to petition. "Courts have long protected the right to petition as an essential attribute of governing. [Citation.] The California Constitution declares that 'people have the right to . . . petition government for redress of grievances . . . .' [Citation.] That right in California is, moreover, vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall." (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 907 [153 Cal.Rptr. 854, 592 P.2d 341].)

The allegations of the first amended cross-complaint asserted against FTCR reveal that Pasadena's cross-action was based on FTCR's intervention in the pending Amy/Pasadena litigation, an act undertaken by FTCR in furtherance of its constitutional rights of free speech and petition. After detailing the background of FTCR's joinder of Amy's effort to compel the city to perform its post-election duties, Pasadena's cross-complaint alleges: "An actual controversy has arisen and now exists between cross-complainants and FTCR with respect to the legal rights and duties of the mayor and City Clerk. FTCR contends in its Complaint in Intervention that the Mayor and City Clerk must perform the duties set forth in Government Code section 34460. Cross-complainants dispute that contention and contend that neither the Mayor nor the City Clerk has any duty to comply with the provisions of Government Code section 34460, and have not yet complied with those provisions, because the Initiative to which those provisions would otherwise apply is unconstitutional and otherwise illegal on its face . . . ."

Similarly, in opposition to the anti-SLAPP motion, Pasadena insisted FTCR had been sued and was a proper defendant in the cross-action precisely

because FTCR chose to intervene and demand that Pasadena certify the Initiative: "FTCR is a proper party cross-defendant. Again, FTCR, *as the admitted sponsor of the initiative, voluntarily intervened* in this lawsuit and has joined petitioner's request that the Court order certain actions which would trigger operation of the initiative. It is remarkable that FTCR says it cannot be sued as the sponsor of the initiative *after it has filed a complaint as a plaintiff intervenor with respect to the same initiative.*"

These statements indicate Pasadena's cross-action against FTCR "arose from" FTCR's constitutionally protected act "of filing litigation." (*Briggs, supra,* 19 Cal.4th at p. 1115.) They also indicate the gravamen of Pasadena's cross-action against FTCR was not the constitutionality of the Initiative, but the dispute over Pasadena's refusal to comply with Government Code section 34460 and its "legal rights and duties" under that statute. The principal thrust of the action, and the only matter then "at issue" between FTCR and Pasadena, was the dispute over Pasadena's duty to perform the ministerial obligations imposed by section 34460. To the extent relevant, the constitutionality of the Initiative was an issue only as support for Pasadena's contention that the unconstitutionality of the Initiative obviated its obligations under the Government Code. Indeed, both Amy and FTCR correctly asserted—and the trial court correctly agreed—that the constitutionality of the Initiative was irrelevant to the Pasadena officials' duty to perform certain ministerial duties under section 34460. (See *Kevelin v. Jordan* (1964) 62 Cal.2d 82, 83 [41 Cal.Rptr. 169, 396 P.2d 585] [the state's Constitution and statutes impose on the Secretary of State the clear ministerial duty to certify an initiative enacted by the voters, and "[t]hey do not empower him to refuse to do so with respect to any particular measure on the ground that the measure is invalid"]; *Martinez v. Board of Supervisors* (1972) 23 Cal.App.3d 679, 684 [100 Cal.Rptr. 334] ["It is well settled that mandamus will not be issued to prevent the official recordation of the vote of the people under their reserved legislative power regardless of the apparent unconstitutionality of the measure, if any"]; *International Assn. of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687, 690–691, & fn. 3 [220 Cal.Rptr. 256] [concluding trial court properly refused to enjoin city from certifying challenged charter amendment because "regardless of how clearly an initiative measure's unconstitutionality may appear, it would be an intolerable interference with the people's reserved legislative power to prevent the official recordation of their vote on such a proposition by the Secretary of State"].)

"In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*Cotati, supra,* 29 Cal.4th at p. 78; see also *Santa Monica Rent Control Board v. Pearl Street, LLC* (2003) 109 Cal.App.4th 1308, 1318 [135 Cal.Rptr.2d 903].) Applying the test to this case, we conclude that FTCR's acts with which Pasadena takes issue "fall[]

squarely within the plain language of the anti-SLAPP statute." (*Navellier, supra,* 29 Cal.4th at p. 90.) Pasadena's pleadings make it clear. FTCR was sued because it had the temerity to file a complaint-in-intervention to force Pasadena to put the Initiative into effect, and because it sponsored the Initiative and supported its constitutionality, all of which are clearly protected activities. Pasadena's first amended cross-complaint is a SLAPP and was properly subject to a special motion to strike under section 425.16. The trial court's conclusion to the contrary was in error.

The inquiry, however, does not end here. Once the moving party demonstrates the challenged claim arose from protected activity, the burden shifts to the responding party to show a probability it will prevail on the merits. (*Equilon, supra,* 29 Cal.4th at p. 67; *Shekhter, supra,* 89 Cal.App.4th at p. 151.) Concluding FTCR's motion foundered on the first prong of the anti-SLAPP test, the trial court never reached the second question. We must do so and, for reasons discussed below, conclude Pasadena could not have made such a showing.

### 2. *Pasadena did not and could not demonstrate a probability of success.*

Notwithstanding the trial court's error with respect to the first prong of the anti-SLAPP test, Pasadena insists the order denying FTCR's motion to strike must be affirmed because Pasadena not only demonstrated a probability of success on the merits of its claim, it actually prevailed. This assertion, which rests on a mischaracterization of the allegations of the cross-complaint and history of the case, is incorrect.

First, Pasadena's contention that it "actually prevailed" on the substance of its cross-complaint against FTCR is incorrect. Pasadena did ultimately prevail below on the substance of its constitutional claim on summary judgment, an error we address below. However, the substance of Pasadena's constitutional claim was not before the trial court when it ruled on the anti-SLAPP motion. Rather, as Pasadena alleged, the principal controversy in the cross-action for declaratory relief involved the parties' disagreement as to whether the city was statutorily required to perform certain postelection ministerial tasks to effectuate the Initiative. Specifically, Pasadena alleged: "An actual controversy has arisen and now exists between cross-complainants and FTCR with respect to the legal rights and duties of the Mayor and the City Clerk. FTCR contends in its Complaint in Intervention that the Mayor and City Clerk must perform the duties set forth in Government Code section 34460. Cross-complainants dispute that contention and contend that neither the Mayor nor

the City Clerk has any duty to comply with the provisions of Government Code section 34460, and have not yet complied with those provisions, because the Initiative to which those provisions would otherwise apply is unconstitutional and otherwise illegal on its face . . . ."

 Pasadena sought a judicial declaration that the Initiative was "unconstitutional or otherwise illegal and unenforceable" and that it had "no duty to take any of the actions set forth in Government Code section 34460 . . . ."[18] Pasadena could not prevail, and did not prevail, on the merits of the claim. As the trial court recognized, it is well established that, irrespective of the constitutionality of an initiative, public officials must perform their ministerial statutory duties to certify the results of an initiative election. (See *Kevelin v. Jordan, supra,* 62 Cal.2d at p. 83 ["[T]he California Constitution and [state statutes] impose on the Secretary of State the clear ministerial duty to file a declaration or statement of the vote on measures submitted to the people. They do not empower him to refuse to do so . . . on the ground the measure is invalid"]; *Martinez v. Board of Supervisors, supra,* 23 Cal.App.3d at p. 684; *International Assn. of Fire Fighters v. City of Oakland, supra,* 174 Cal.App.3d at pp. 690–691, and fn. 3.) Thus, while Pasadena certainly hoped to, and later did, obtain a declaration that the Initiative was unconstitutional, the court was not required to resolve that question in order to adjudicate the dispute over the city's duty to comply with Government Code section 34460.

As to the pivotal matter addressed by FTCR's motion to strike—whether Pasadena was obligated to certify the Initiative—a long and well-established line of cases, led by *Kevelin,* demonstrate that Pasadena could not and did not prevail. Indeed, the trial court specifically relied on these authorities in granting Amy's petition for a writ of mandate ordering Pasadena to comply with Government Code section 34460, a ruling with which Pasadena does not take issue. Pasadena did not prevail on the principal claim raised in its cross-complaint, and FTCR's anti-SLAPP motion should have been granted.

3. *Pasadena could not prevail on the merits because there was no justiciable controversy at issue at the time the anti-SLAPP motion was heard and ruled upon.*

Even if we indulge Pasadena's argument that its constitutional challenge to the Initiative was independent of the claim related to its duty to comply with Government Code section 34460, we would still conclude that Pasadena had not shown a probability of success on the merits because the constitutional claim was not ripe for judicial review.

---

[18] The constitutionality of the Initiative was a predicate component of the ultimate relief sought—a declaration that the city had no duty to certify the Initiative.

First, Pasadena's constitutional challenge was premature, in that the city persisted in its refusal to certify the Initiative. That refusal prevented the Initiative from taking effect and prevented the court from addressing an actual, concrete justiciable controversy. Under the rule of *Kevelin v. Jordan* and its progeny, respect for the doctrine of separation of powers and concern for the electorate's constitutionally reserved initiative power does not permit courts to adjudicate the constitutionality of a ballot measure after the measure has been adopted by the voters, but before it has become effective.[19] (*Kevelin v. Jordan, supra*, 62 Cal.2d at p. 83.)

Second, Pasadena could not have demonstrated a probability of prevailing on the substance of its cross-action against FTCR, because that action was not ripe when the cross-action was filed or when the anti-SLAPP motion was heard. At that time, Pasadena's constitutional claims involved only hypothetical concerns because the Initiative had not been applied to anyone. "In determining whether a controversy is ripe, we use a two-pronged test: (1) whether the dispute is sufficiently concrete to make declaratory relief appropriate; and (2) whether the withholding of judicial consideration will result in a hardship to the parties." (*Farm Sanctuary, Inc., supra*, 63 Cal.App.4th at p. 502.) Pasadena's insufficiently concrete claim against FTCR foundered on the first prong of this test. When the cross-action was filed, no one had complained that enforcement of the Initiative would violate his or her civil or constitutional rights in any concrete fashion.[20]

---

[19] In support of its argument that a justiciable controversy existed, Pasadena incorrectly asserts that the Initiative had been in effect for over two weeks when the anti-SLAPP motion was denied. The motion to strike was denied at the conclusion of the hearing on May 31, 2002, although the formal order denying that motion was not signed until June 21, 2002; the Initiative took effect on June 6, 2002.

[20] Pasadena's reliance on *California Water & Telephone Co.* and *Farm Sanctuary, Inc.*, to support its assertion the case was sufficiently ripe, is misplaced. In contrast to this Initiative, the measures challenged in those cases were already in effect, and their potential penalties enforceable, when the litigation was filed. (*California Water & Telephone Co., supra*, 253 Cal.App.2d at pp. 22, 26; *Farm Sanctuary, Inc., supra*, 63 Cal.App.4th at pp. 502–504.)

Moreover, unlike *Farm Sanctuary, Inc.*, in which the intended beneficiaries of the law (farm animals) would suffer needlessly without judicial action and who were incapable of protecting their own interests, the public officials and their potential campaign contributors who may be affected by this Initiative, can assert their own legal challenge in court. Moreover, withholding judicial consideration imposes no hardship on the Pasadena Mayor or City Clerk who, at the time the cross-complaint was filed and the anti-SLAPP motion was heard, were not embroiled "in a real controversy . . . involving *justiciable questions* relating to their own rights and obligations." (See *Wilson, supra*, 199 Cal.App.2d at p. 722; see also *Sherwyn, supra*, 173 Cal.App.3d at p. 58 ["The controversy must be 'one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. . . .' "].)

 Pasadena's cross-action also fails the second prong of the ripeness test. The withholding of judicial consideration imposed no hardship on Pasadena. Because the Initiative had not yet been implemented, no potential campaign contributor or public official had complained or had been faced with the dilemma of complying with the measure or risking penalties or prosecution for failing to do so. Where a legislative measure does not immediately and adversely impact anyone and its effects cannot be adjudicated in any concrete factual context, a request for declaratory relief is not yet ripe. (See *Longshoremen's Union v. Boyd* (1954) 347 U.S. 222, 224 [98 L.Ed. 650, 74 S.Ct. 447] ["Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function"]; *Pacific Legal Foundation, supra,* 33 Cal.3d at pp. 172–173 [concluding that case is not sufficiently ripe if " '[plaintiffs] are not immediately faced with the dilemma of either complying with the guidelines or risking penalties for violating them' "].) Courts simply may not render advisory opinions on controversies which the parties fear will arise, but which do not presently exist.

We also reject Pasadena's contention that its cross-claim, which was nonjusticiable when the cross-action was filed and the anti-SLAPP motion was heard, ripened after the trial court ruled against it and ordered Pasadena to certify the Initiative. FTCR is correct. In the context of an anti-SLAPP motion, "it is especially important to view a motion to strike under section 425.16 in light of the facts and pleadings as they exist at the time the motion is filed." The anti-SLAPP statute established a mechanism which permits nonmeritorious claims arising from the exercise of First Amendment rights to be evaluated and resolved at the earliest stages of a lawsuit, so that defendants are not forced needlessly to participate in expensive and protracted litigation. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 865 [44 Cal.Rptr.2d 46].) We cannot sanction Pasadena's contention, based entirely on inapposite and unpersuasive non-California authorities, that it cured its unripe, nonjusticiable cross-complaint after the trial court ruled on FTCR's meritorious anti-SLAPP motion. To do so would undermine the purpose of section 425.16. The underlying statutory purpose is particularly apt here, where the jurisdictional defect and principal focus of the parties' dispute—Pasadena's duty to comply with Government Code section 34460—existed only because Pasadena refused to certify the Initiative. In the final analysis, we conclude Pasadena's cross-complaint against FTCR was not based on an actual concrete controversy, but was merely an attempt to obtain

an improper advisory opinion on the constitutionality of the Initiative, based on a hypothetical controversy which may never arise.[21]

In the end, we conclude that, because FTCR met its burden of demonstrating that the action filed against it arose out of its exercise of protected First Amendment rights, and because Pasadena failed to demonstrate a probability of success on the merits of its nonjusticiable claim, the anti-SLAPP motion should have been granted and the motion dismissed.[22]

B. *The summary judgment motion.*

*The perfection of FTCR's appeal from the denial of its anti-SLAPP motion divested the trial court of jurisdiction to entertain the motion for summary judgment.*

Code of Civil Procedure section 916 states: "Except as provided in [statutes not implicated here], the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (§ 916, subd. (a).)

■ "The purpose of the rule depriving the trial court of jurisdiction during the pending appeal is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided. The rule prevents the trial court from rendering an appeal futile by altering the appealed judgment or order by conducting other proceedings that may affect it. [Citation.]" (*Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 629 [5 Cal.Rptr.2d 742]; *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1428 [103 Cal.Rptr.2d 174], quoting *Elsea.*) "Accordingly, whether a matter is 'embraced' in or 'affected' by a judgment within the meaning of section 916 depends upon whether postjudgment trial court proceedings on the particular matter would have any impact on the 'effectiveness' of the appeal. If so, the proceedings are stayed; if not, the proceedings are permitted." (*Elsea, supra*, 4 Cal.App.4th at p. 629.)

---

[21] Of the five cities which enacted the Oaks Initiative, only San Francisco chose not to challenge the measure. According to FTCR, and neither the record nor our own research has disclosed any evidence to the contrary, the Initiative has been implemented in San Francisco without incident or judicial challenge since July 2001.

[22] Our conclusion that the action is not ripe, and therefore not justiciable, renders it unnecessary for us to address the parties' arguments on the issue of standing.

The parties dispute whether the issues raised in Pasadena's motion for summary judgment were "embraced" or "affected" by the order denying FTCR's anti-SLAPP motion. FTCR argues that they were and that the trial court exceeded its jurisdiction by ruling on the summary judgment motion while its appeal was pending. Pasadena insists the court retained jurisdiction to entertain the motion because the underlying merits of its declaratory relief claim were not a matter "embraced in" or "affected by" the pending appeal. Pasadena is mistaken. Once the appeal was perfected, further trial court proceedings were automatically stayed.

Pasadena's argument is premised on the fact that the trial court addressed only the first prong of the anti-SLAPP test in denying FTCR's motion to strike. That reliance is misplaced. FTCR's section 425.16 motion sought to strike, as legally insufficient, the entirety of Pasadena's cross-action. That whole motion was denied, and it is that ruling from which an appeal was taken.

▇▇▇ Pasadena's argument that resolution of the appeal from the denial of the anti-SLAPP motion is confined to a consideration of the precise grounds on which the trial court ruled is incorrect as a matter of law. The appeal was taken from the ruling denying FTCR's special motion to strike. While the rationale for a ruling may be of interest or even instructive, it is a fundamental tenet of appellate law that, with limited exceptions not applicable here, we review the trial court's ruling, not its rationale. (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980–981 [35 Cal.Rptr.2d 669, 884 P.2d 126]; *Aheroni v. Maxwell* (1988) 205 Cal.App.3d 284, 292 [252 Cal.Rptr. 369].)

▇▇▇ The anti-SLAPP law is designed to expeditiously dispose of merit-less lawsuits based on a defendant's exercise of free speech or petition rights. (*Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 741 [36 Cal.Rptr.2d 687].) In an effort to further this statutory goal, the Legislature amended section 425.16 in 1999 to make orders granting or denying anti-SLAPP motions immediately appealable. (§ 425.16, subd. (j).) Prior to that change, a defendant whose meritorious anti-SLAPP motion was denied had only two options. "The first is to file a writ of appeal, which is discretionary and rarely granted. The second is to defend the lawsuit. If the defendant wins, the anti-SLAPP statute is useless and has failed to protect the defendant's constitutional rights." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1675 (1999–2000 Reg. Sess.), p. 6.) The amendment to section 425.16 reflects the Legislature's express intention to automatically stay trial court proceedings. A Senate Judiciary Committee report on Assembly Bill 1675, creating the right of appeal from an anti-SLAPP order, states: "This bill would provide that an

order granting or denying a special motion to strike shall be immediately appealable, and therefore, the perfecting of the appeal would stay proceedings in the trial court." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1675 (1999–2000 Reg. Sess.), as amended May 28, 1999, p. 3; see also Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1675 (1999–2000 Reg. Sess.), as amended July 12, 1999, p. 3 [relying on Code Civ. Proc., § 916, and explaining that "the perfecting of the appeal [from an order on an anti-SLAPP motion] would stay proceedings in the trial court"].)[23]

Our conclusion that the trial court was divested of jurisdiction to consider the merits of Pasadena's summary judgment motion once FTCR filed its appeal finds direct support in a recent decision by Division Four, *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179 [121 Cal.Rptr.2d 794] (*Mattel*). After an appeal from the denial of an anti-SLAPP motion was filed in a malicious prosecution action, the trial court set a trial date notwithstanding the pending appeal. The appellate court held that an appeal from the denial of a special motion to strike automatically stays all trial court proceedings on the merits of the underlying action pending resolution of the appeal. In words equally applicable to this action, the court explained: "Here, the language significant within section 916 for purposes of our discussion is the phrase 'upon the matters embraced therein or affected thereby.' The special motion to strike was directed to the only cause of action asserted . . . and challenged its legal viability. That is also the focus on appeal. It follows that the appeal embraces the entirety of the action and the automatic stay is triggered. Thus, the trial court was divested of jurisdiction upon perfection of the appeal and it acted in excess of jurisdiction by setting a trial date." (*Mattel, supra,* 99 Cal.App.4th at p. 1190.)[24]

---

[23] We take judicial notice of portions of the legislative history of section 425.16. (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Schmidt v. Southern Cal. Rapid Transit Dist.* (1993) 14 Cal.App.4th 23, 30, fn. 10 [17 Cal.Rptr.2d 340] ["In a search to discern legislative intent, an appellate court is entitled to take judicial notice of the various legislative materials, including committee reports, underlying the enactment of a statute"].)

[24] The Supreme Court has granted review of the only published decision to disagree with *Mattel* on this point. In *Varian Medical Systems, Inc. v. Delfino* (2003) 113 Cal.App.4th 273 [6 Cal.Rptr. 3d 325], review granted March 3, 2004, S121400 [10 Cal.Rptr. 3d 536 [85 P.3d 444]], the court held the filing of an appeal from the denial of an anti-SLAPP motion does not automatically stay the entire trial court proceeding. (*Id.* at p. 355, fn. 16.) In granting review, the Supreme Court ordered the parties in *Varian* to limit their argument to the issue of whether "an appeal from the denial of a special motion to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16) effect[s] an automatic stay of the trial court proceedings[.]" (*People v. Reed* (1961) 188 Cal.App.2d 395 [10 Cal.Rptr. 536].) Given the legislative purpose underlying a defendant's right of immediate appeal under section 425.16, subdivision (j), we anticipate the Supreme Court will conclude *Varian* was wrongly decided.

Under *Mattel* and the plain language of section 916, we conclude the trial court acted in excess of its subject matter jurisdiction by entertaining and ruling upon Pasadena's motion for summary judgment while FTCR's appeal from the denial of its anti-SLAPP motion was pending before this court. "[T]he perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby . . . ." (Code Civ. Proc., § 916, subd. (a).) The issue of the validity of Pasadena's cross-action for declaratory relief was embraced within the trial court's order denying FTCR's special motion to strike. That very issue was adjudicated by the trial court's extrajurisdictional ruling on the summary judgment motion, which must be reversed.[25]

## C. *The motion for "private attorney general" fees.*

The final portion of the consolidated appeals involves FTCR's motion to recover attorneys' fees under the "private attorney general" statute, Code of Civil Procedure section 1021.5, based on obtaining a preemptory writ ordering Pasadena to fulfill its ministerial obligations under Government Code section 34460. The trial court denied the attorneys' fee motion on the grounds that FTCR's participation in the writ proceeding had not been "necessary" to its successful outcome, and that FTCR, as sponsor of the Oaks Initiative, had a "direct interest" in the enforcement of the measure, which precluded it from obtaining a fee award. FTCR insists the trial court misconstrued section 1021.5 and applied an incorrect legal standard. We agree.

### 1. *The standard of review.*

 Decisions awarding or denying attorneys' fees are reviewed under an abuse of discretion standard. The trial court's discretion " ' "is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]" ' " (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704] (*City of Sacramento*).) The discretion is subject to the limitations of the legal principles governing the subject of the action. The question is whether the trial court's grounds for denying a fee award are

---

[25] We find no merit in Pasadena's argument that FTCR should not be permitted to invoke section 425.16's purpose of quickly eliminating meritless lawsuits because, at the hearing on its motion, FTCR "urged" the trial court not to address the second prong of the anti-SLAPP test. The record reflects otherwise. At the hearing on the anti-SLAPP motion, the court indicated its intention to rule not just on the first prong, but to find Pasadena had shown a probability of prevailing on the merits. The court later "backed off" that portion of its proposed ruling after FTCR pointed out the court logically could not determine Pasadena was likely to prevail without first deciding the foundational question as to whether the case presented a live controversy, an issue on which the trial court expressly declined to rule.

consistent with substantive law of section 1021.5 and, if so, whether their application to the facts falls within the range of discretion conferred under section 1021.5, read in light of the purposes and policy of that statute. To decide this question, we first determine whether the court understood the appropriate legal standard. If it did, we then determine whether the application of that standard to the facts was within the scope of its discretion under the statute. (*Punsly v. Ho* (2003) 105 Cal.App.4th 102, 113 [129 Cal.Rptr.2d 89] (*Punsly*); see also *Crawford v. Board of Education* (1988) 200 Cal.App.3d 1397, 1406 [246 Cal.Rptr. 806] (*Crawford*) [to determine if discretion is abused, the appellate court reviews "the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fees and whether it applied the proper standards of law in reaching its decision"; *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 544 [63 Cal.Rptr.2d 118] (*Hewlett*) [same].) With these principles in mind, we turn to the grounds advanced by the trial court for its ruling.

### 2. *The purpose of Code of Civil Procedure section 1021.5.*

Section 1021.5 codified the judicially developed "private attorney general" fee doctrine. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*).) The primary purpose of the statute is " 'to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.' ([*D'Amico v. Board of Medical Examiners* (1974)] 11 Cal.3d 1, 27 [112 Cal.Rptr. 786, 520 P.2d 10]].)" (*Serrano v. Priest* (1977) 20 Cal.3d 25, 43 [141 Cal.Rptr. 315, 569 P.2d 1303].) The doctrine is premised "upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills, supra,* 23 Cal.3d at p. 933.)

Section 1021.5, in relevant part, authorizes the trial court to "award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, [and] (b) the necessity and financial burden of private enforcement, . . . are such as to make the award appropriate."[26] Pasadena concedes FTCR is a "successful party" whose

---

[26] A third statutory factor, whether "such fees should . . . in the interest of justice be paid out of the recovery, if any," is not implicated in this declaratory relief action. (§ 1021.5, subd. (c); see *Press v. Lucky Stores* (1983) 34 Cal.3d 311, 318, fn. 5 [193 Cal.Rptr. 900, 667 P.2d 704].)

intervention "has 'resulted in the enforcement of an important right affecting public interest,' thereby conferring a 'significant benefit' on 'the general public or a large class of persons.' "

The issue is whether the trial court erred as a matter of law by misconstruing and misapplying the "necessity and financial burden of private enforcement" prong of section 1021.5, subdivision (b). We conclude it did.

### 3. *The "necessity . . . of private enforcement" criterion is met here.*

The initial writ of mandate petition seeking to force Pasadena to fulfill its ministerial obligations under Government Code section 34460 and certify the Initiative was filed by Amy. In both the answer to the petition and the cross-complaint for declaratory relief filed against Amy, Pasadena admitted it had not complied, and did not intend to comply, with section 34460 because it believed "the initiative is unconstitutional." Amy responded that he was not a proper party to Pasadena's cross-complaint. No actual controversy existed with respect to the constitutionality of the Initiative, because Amy had "no legal interest in that issue," and neither "agree[d] nor disagree[d] with [Pasadena's] position on the legality of the [Initiative]." On the same date Amy filed his reply, FTCR sought and obtained leave to intervene on the ground that Pasadena's arguments in opposition to Amy's writ petition "raise[d] issues of fundamental importance to the integrity of democratic process," and posed a grave threat to the initiative process as a whole. FTCR filed its complaint-in-intervention and joined Amy's writ petition.

FTCR's arguments in support of the writ petition went further than Amy's. Amy, who freely admitted "no legal interest in determining the constitutionality of the [Initiative]," argued essentially that Pasadena was not free to effectively "veto" the Initiative by refusing to perform its admitted ministerial duties under Government Code section 34460, simply because it was "disappointed with the results of an election." FTCR went much further. In addition to supporting Amy's contentions, FTCR presented arguments and authorities which directly refuted Pasadena's purported "defense," on which the trial court expressly relied in granting the writ of mandate. Nevertheless, when ruling on FTCR's motion for private attorney general fees, the court denied the motion on the ground that it "probably would have granted" the writ petition anyway. In making its finding, the court essentially adopted Pasadena's assertion that FTCR was not entitled to fees because it had not made a "unique contribution" to Amy's pending litigation.

The essence of the trial court's ruling was that FTCR's intervention was "not of a significant level," because Amy had already raised the issue of Pasadena's duty to certify the Initiative irrespective of its views as to its

validity, a contention with which the court "probably" would have agreed in granting the writ. The practical effect of the ruling required FTCR to show that the court would have denied the requested relief "but for" its intervention in order to recover attorneys' fees. We cannot sanction such a rule.

 The trial court misinterpreted and misapplied the portion of section 1021.5 which requires a finding that the "necessity . . . of private enforcement . . . [is] such as to make the award appropriate." (§ 1021.5, subd. (b).) In the first place, the "necessity of private enforcement" prong of the section 1021.5 test " 'looks to the adequacy of *public* enforcement and seeks economic equalization of representation in cases where private enforcement is necessary.' " (*City of Sacramento, supra,* 207 Cal.App.3d at p. 1299; accord, *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1103 [240 Cal.Rptr. 569, 742 P.2d 1290] ["It is obvious that private enforcement to give effect to [a bill amending the Welfare and Institutions Code] was necessary since the director of the department refused to promulgate regulations to implement the section"]; *Hewlett, supra,* 54 Cal.App.4th at pp. 544–545; *Committee to Defend Reproductive Rights v. A Free Pregnancy Center* (1991) 229 Cal.App.3d 633, 639 [280 Cal.Rptr. 329] (*Committee to Defend*).) Where, as here, a lawsuit is brought against the very governmental entity and officials who refuse to comply with their admitted statutory responsibilities, the "necessity of private enforcement" portion of the test is readily met. (*Woodland Hills, supra,* 23 Cal.3d at p. 941; see also *Committee to Defend, supra,* 229 Cal.App.3d at p. 639 ["Where a private suit is brought against a governmental agency or official, the necessity of private enforcement is often obvious. A governmental agency cannot be expected to bring suit against itself. In such situations, private citizens must ' "guard the guardians" ' "].) Thus, under the "necessity" prong of section 1021.5, the court looks only to whether there is a need for a private attorney general for enforcement purposes, because no public attorney general is available.

In this case, in which Amy and FTCR joined forces to "guard the guardians," Pasadena insists that, in determining whether an attorneys' fees award is warranted or by whom, the "necessity" portion of the test not only looks to the availability of public enforcement, but weighs the relative contributions of each private guardian. This assertion, for which independent research yields no support, is also unsupported by the authorities on which Pasadena relies.

In *Hewlett,* the court upheld an award of fees under section 1021.5 to two private plaintiffs, Hewlett and the Sierra Club, who were joined by a district attorney in an action against Squaw Valley Ski Corporation for unlawfully cutting down trees to develop a new ski run. Plaintiffs prevailed and the trial court awarded $480,000 in attorneys' fees to Hewlett, and $192,000 to the

Sierra Club. (*Hewlett, supra,* 54 Cal.App.4th at pp. 516–518.) The dispute on appeal centered "on the question of whether private enforcement was necessary." (*Id.* at p. 544.) The court found private enforcement was necessary and affirmed the award, based on its agreement with the trial court that the scope and prosecution of the action was beyond the capabilities of the district attorney's office. Hewlett's attorney undertook primary responsibility for the prosecution, and the Sierra Club's counsel provided expertise on the historical and factual background of the action as well as land use and forestry issues. (*Id.* at pp. 545–546.) The court found the action was not " 'opportunistic or collusive' " or " 'undertaken simply to generate such attorney fees,' " and agreed with the trial court that "the involvement of [both private plaintiffs] was . . . necessary to the successful prosecution of th[e] case." (*Id.* at pp. 545–546, fn. 31.)

Contrary to Pasadena's supposition that *Hewlett* "suggest[s] that it is appropriate to analyze the relative contributions made by private parties, even in cases where public enforcement is insufficient," there is no indication the court in *Hewlett* did or considered doing so in determining fee entitlements. On the contrary, consistent with the test articulated above, the court noted that the "necessity of private enforcement" factor looks only to the adequacy of public enforcement in light of public enforcement efforts, and it did not weigh the relative contributions of the private parties in affirming their fee awards. In addition, *Hewlett* did not employ the "but for" test to which the trial court in this case subscribed. Rather, it relied on the proper standard, outlined in *Committee to Defend, supra,* 229 Cal.App.3d 633, which holds that an attorneys' fee award is appropriate unless the private party litigating with a public agency performs only "duplicative, unnecessary, and valueless services," or unless the private action was " 'opportunistic or collusive and undertaken simply to generate such attorney fees.' [Citation.]" (*Hewlett, supra,* 54 Cal.App.4th at p. 545, and fn. 31.)

The second case on which Pasadena relies, *Crawford, supra,* 200 Cal.App.3d 1397, provides even less support for its assertion that the trial court is free to weigh the relative contributions of private parties in determining whether to award private attorney general fees at all. *Crawford* involved the remedial phase of almost 20 years of school desegregation litigation against the Los Angeles Unified School District. Five private intervenors sought attorneys' fees under section 1021.5. Their requests were denied, and the court of appeal affirmed that ruling. (*Crawford,* at pp. 1404, 1410.)

Using a selective quote from *Crawford,* Pasadena suggests the court's decision was based on its conclusion that the intervenors failed to satisfy the "necessity of private enforcement" criterion in light of the contributions made by other private parties. That is incorrect. The court in *Crawford* affirmed the

denial of the intervenors' attorneys' fee motions because no causal connection was shown between their efforts and the outcome of the litigation. Although the intervenors made significant contributions at the trial level, they failed to satisfy a threshold criterion for a fee award under section 1021.5, and "were not prevailing parties within the meaning of section 1021.5" with respect to the remedial phase of the litigation. (*Crawford, supra,* 200 Cal.App.3d at pp. 1406, 1410.) Rather, the practical result of the litigation—the desegregation plan ultimately adopted by the school district—was achieved as a result of the passage of a ballot proposition, not through the intervenors' efforts. (*Id.* at p. 1408.)

Moreover, we disagree with Pasadena's assertion that the policies underlying section 1021.5 support a trial court's ability to weigh the contributions of multiple private attorneys general in determining whether each is entitled to attorneys' fees. On the contrary, the policies underlying the intervention and private attorney general statutes support the opposite conclusion. A party who satisfies the criteria for intervention and who contributes to the success of public interest litigation should be entitled to an award of attorneys' fees on the same terms as any other party.

Two basic principles drive this rule. First, when a party qualifies and enters an action as an intervenor, it is vested "with all of the same procedural rights and remedies of the original parties" (*Catello v. I.T.T. General Controls* (1984) 152 Cal.App.3d 1009, 1013–1014 [200 Cal.Rptr. 4]), including the right to seek attorneys' fees under section 1021.5 in a public interest lawsuit on equal terms with the original parties. (*Crawford, supra,* 200 Cal.App.3d at p. 1405.) Second, the policy underlying section 1021.5 encourages a party without substantial resources to prosecute actions to vindicate important public constitutional and statutory rights, knowing that if it prevails it will receive financial compensation for its substantial efforts in that endeavor.

By denying attorneys' fees to FTCR because it "probably" would have granted Amy's writ petition anyway, the trial court's ruling undermines both of these policies. The rationale articulated for the ruling would effectively require prospective public interest intervenors to refrain from intervening and to speculate whether the plaintiff and/or the trial court will succeed in protecting their interests and vindicating important public policies implicated in a case, based solely on the pleadings filed by the original plaintiff in his nascent action. Based on those pleadings, if it believes the plaintiff will prevail without its assistance, the prospective intervenor dare not intervene.

That conclusion is so because, if it does intervene, and the court agrees with its assessment, the intervenor will incur substantial litigation expenses and fees without any chance of reimbursement under section 1021.5. On the other hand, if the prospective intervenor guesses incorrectly, and the plaintiff loses the action without the intervenor's participation, neither the intervenor's nor the public's interests will have been protected.

Taken together, the policies underlying both the intervention and private attorney general statutes are designed to encourage interested parties who might otherwise lack the resources to aggressively pursue meritorious public interest litigation. The policies are inconsistent with the ruling made by the trial court, which conditions an intervenor's entitlement to private attorney general fees on an after-the-fact assessment of whether the intervenor's participation was "necessary" to the successful result achieved. (Cf., *Seattle School Dist. No. 1 v. State of Wash.* (9th Cir. 1980) 633 F.2d 1338, 1349–1350 ["It is usually impossible to determine in advance of trial which issues will be reached or which parties will play pivotal roles in the course of the litigation. To retrospectively deny attorney's fees because an issue is not considered or because a party's participation proves unnecessary would have the effect of discouraging the intervention of what in future cases may be essential parties. . . . [¶] . . . Because an award of attorney's fees in this case is essential to effectuate the congressional purpose of encouraging future constitutional litigation in similar circumstances, we conclude that the District Court abused its discretion in denying intervenors' attorney's fees."].)

We do not hold that a trial court may not consider the relative contributions of multiple private attorneys general when it exercises its discretion to determine the proper amount of an attorneys' fee award. On the contrary, to the extent both the original plaintiff and the intervenor seek to recover fees for time spent that was superfluous to the results achieved by the litigation, or duplicative of one another's efforts, those factors may properly be used to reduce, or perhaps deny altogether, a particular fee request. (See, e.g., *Crawford, supra,* 200 Cal.App.3d at p. 1407 [intervenors who "contribute[] little or nothing of substance in producing [the] outcome" may be denied fees]; *Committee to Defend, supra,* 229 Cal.App.3d at p. 643 [no fees should be awarded to private party that performed "duplicative, unnecessary, and valueless services"].)

In this case, the trial court committed legal error and misinterpreted section 1021.5 by requiring FTCR to show the requested writ relief would not have issued "but for" its participation in the litigation. To be entitled to an attorneys' fees award under section 1021.5, FTCR needed only to show it was a "successful party" in an action that "resulted in the enforcement of an important right affecting the public interest." Because Pasadena concedes FTCR has satisfied both points, the trial court on remand will be required to exercise its discretion to determine the amount of fees to which FTCR is entitled.

### 4. FTCR also satisfied the "financial burden" prong of Code of Civil Procedure section 1021.5, subdivision (b).

The final basis for the trial court's denial of FTCR's attorneys' fee request was its conclusion that FTCR also failed to satisfy the "necessity" prong of section 1021.5, because its substantial personal interest in the outcome outweighed the burdens suffered in litigating the matter. This rationale also was erroneous.

 A litigant is entitled to an attorneys' fee award under the "necessity" prong when " 'the cost of the claimant's legal victory transcends [the litigant's] personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the [claimant] "out of proportion to his individual stake in the matter." [Citation.]' " (*Woodland Hills, supra,* 23 Cal.3d at p. 941.)

Pasadena readily acknowledges that FTCR would have been eligible for attorneys' fees under section 1021.5 had it initiated litigation to compel the city to comply with Government Code section 34460, rather than intervene in Amy's lawsuit. In its own words, "[Pasadena] admit[ted] at the outset that if intervenors had themselves filed the writ action to compel compliance with Government Code section 34460, there would [have been] little dispute that Intervenors' objective went beyond their own interests to serve the broader public good."

 We discern no principled reason for concluding, as did the trial court, that FTCR's stake in a public interest action directed at vindicating the interests of Pasadena voters in implementing the Initiative they approved became purely personal, and therefore sufficient to disqualify it from obtaining attorneys' fees, simply because it joined Amy's action rather than filing its own. As the sponsor and proponent of the embattled Initiative, the intervenors—FTCR and Monsour—had a " 'personal interest' in the litigation

in the broad sense that they were emotionally and intellectually connected to the litigation in ways that the general public was not. But it [was] ridiculous to disqualify them from a fee award because of their 'interest.' If anyone should have gotten fees under section 1021.5, they should have . . . ." (*Hammond v. Agran* (2002) 99 Cal.App.4th 115, 125–126 [120 Cal.Rptr.2d 646].) For purposes of determining a public interest litigant's entitlement to private attorney general fees, the question is whether "the cost of litigation [was] out of proportion to the individual litigant's stake in the litigation?" (*Punsly, supra,* 105 Cal.App.4th at p. 117; see *Woodland Hills, supra,* 23 Cal.3d at p. 941.) The financial burdens on FTCR of litigating this matter unquestionably outweighed the organization's ideological interest in implementing the voters' will. Numerous cases have concluded that ballot measure proponents, with no financial or personal interests at stake, qualified for section 1021.5 fee awards in actions brought to enforce those measures or qualify them for the ballot. (See *Press v. Lucky Stores, supra,* 34 Cal.3d at p. 321; *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 228–232 [226 Cal.Rptr. 265]; *Washburn v. City of Berkeley* (1987) 195 Cal.App.3d 578, 584–586 [240 Cal.Rptr. 784].) For purposes of determining FTCR's entitlement to private attorney general fees, no principled reason exists to treat this case any differently, simply due to the timing of FTCR's intervention. To the extent the trial court finds, as a factual matter, that FTCR's efforts in obtaining the writ of mandate duplicated those of Amy, that factor is properly considered in determining the amount of attorneys' fees, rather than the entitlement to fees.[27]

The matter must be remanded to the trial court to review FTCR's motion for attorneys' fees under section 1021.5 using the appropriate legal principles, and to properly exercise its discretion with respect to the application of the principles to the facts.

---

[27] We will not address Pasadena's contention that the trial court's order denying fees to FTCR may be upheld because FTCR's "reputational interest" in ensuring the implementation of the Initiative in Pasadena, which would assist its future ability to promote and obtain passage of the Initiative in other cities, outweighed the financial burdens involved in joining this action. This argument was not raised or ruled on below, and the record contains no evidence that would support the city's factual contention. (See, e.g., *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 516 [94 Cal.Rptr.2d 205] [a party's nonpecuniary interest is insufficient to block an attorney's fees award under the financial burden criterion unless it is "specific, concrete and significant, *and* these attributes must be based on *objective* evidence"].)

**DISPOSITION**

The order dismissing the Santa Monica action is affirmed. In the Pasadena action, the orders denying the anti-SLAPP motion, and granting the motion for summary judgment are reversed. The order denying Monsour and FTCR's motion for attorneys' fees under Code of Civil Procedure section 1021.5 is also reversed, and matter remanded for reconsideration under the principles outlined above. In the Pasadena action, FTCR is to recover its attorneys' fees and costs on appeal. FTCR is to recover its costs on appeal in the Santa Monica action.

Cooper, P. J., and Flier, J., concurred.

A petition for a rehearing was denied February 28, 2005, and the opinion was modified to read as printed above. The petitions of appellant City of Santa Monica and respondent City of Pasadena for review by the Supreme Court were denied April 27, 2005.