Filed 5/15/26  In re A.G. CA3

<u>NOT TO BE PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | C103934 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>V.G.,<br>        Defendant and Appellant. | (Super. Ct. No. JD000199) |

Appellant V.G., mother of the minor, appeals from the juvenile court's orders summarily denying her petitions for modification without a hearing.  (Welf. & Inst. Code, §§ 300, 388, 395.)[1]  Mother also claims the juvenile court and the Sacramento County Department of Child, Family and Adult Services (Department) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act of 1978 (ICWA).  (25 U.S.C. § 1901 et seq.)  We will affirm the juvenile court's orders.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

BACKGROUND

*Solano County Proceedings*

In December 2023, the newborn minor was detained from mother by Solano County Health and Social Services (Solano County Department) due to mother's untreated and unmedicated mental health issues, including schizoaffective disorder, borderline personality disorder, and posttraumatic stress disorder with disassociated symptoms. When mother gave birth to the minor, she exhibited symptoms of her psychiatric disorders, including agitation and heightened paranoia and she lacked an overall understanding of how to care for the minor. Mother refused to provide information regarding the alleged father's name or date of birth and his whereabouts were unknown.

The Solano County juvenile court exercised dependency jurisdiction over the minor in February 2024 pursuant to section 300, subdivisions (b) and (g), and ordered reunification services and visitation for mother. Court ordered services included mental health counseling, a mental health assessment, general counseling, parenting education, and obtaining and maintaining suitable housing. The minor was placed with a foster caretaker on December 6, 2023.

*Sacramento County Proceedings*

In November 2024, the matter was transferred to Sacramento County where mother resided. Mother reported she was staying in a bedroom in a home but did not pay rent or utilities, did not receive any services, and was not employed. She also reported she had everything sent to a post office box, claiming she was in fear of being found by a woman who had been stalking her and would hurt her. She was uncomfortable with the court having her address and requested that it be kept confidential. The juvenile court accepted the transfer from Solano County on December 16, 2024. The court adjudged the minor a dependent child, ordered reunification services and supervised visitation for

mother, and ordered that she submit to a mental health assessment to ensure reunification services were tailored to her needs.

Mother's progress in reunification services over the next several months was minimal and the Department concluded she had not made significant progress in resolving the issues that led to the minor's removal. As of February 2025, she completed parenting classes but struggled to articulate or demonstrate an understanding of the minor's development or age-appropriate behaviors or cues and needed constant guidance and reinforcement during visits. She was not consistent in meeting with her therapist and she never responded to attempts by psychiatry to schedule an appointment. She continued to display distrust, paranoia, and dysregulation during therapy sessions. Her medication compliance was lacking, as she was not regularly filling her prescriptions.

Mother's supervised visits with the minor were consistent but challenging, as she reportedly presented with "severe mental health challenges that impact her ability to fully engage with her child." Mother's paranoia fluctuated unpredictably. She exhibited anxiety when the minor cried or made sudden movements, often distracting her from the visit and the opportunity to bond with the minor. While there was "slight progress" in mother's ability to calm the minor, the minor frequently became upset during visits, crying inconsolably until visits concluded but settling quickly once returned to his caregiver. Mother spent much of her time during visits expressing concerns about the cleanliness of the room or inquiring about return of the minor to her care, further distracting her from time with the minor. The social worker observed that the bond between mother and the minor remained underdeveloped, as mother struggled with basic caregiving tasks.

On February 3, 2025, at the 12-month review hearing, the juvenile court adopted the Department's recommended findings and orders, including continued supervised visits for mother and continued out-of-home placement for the minor.

As of June 2025, the Department recommended that the juvenile court terminate mother's reunification services and set a section 366.26 hearing. The minor remained in the foster home he had been in since December 6, 2023, and was doing well. Mother was still living in a bedroom in a house with other tenants where she did not have access to the kitchen or laundry room. She was refusing to have contact with the Department and was directing that all contact go through her "representative, Erskine White."[2] Mother's therapist reported she could not share information regarding mother's therapy because mother had withdrawn her release of information the week prior. Mother also stated she would not speak to the social worker any longer, insisting questions would have to go through White. Mother was referred to family therapy but would not take a call from the therapist and directed the call to White. The Department informed mother and White that it would not be discussing the confidential case with White.

Mother completed parenting classes in June 2024 but continued to struggle to articulate an understanding of the minor's behaviors and cues and still needed constant guidance and reinforcement during visits. She participated in one-on-one parent-child therapy once a week for several weeks, and the social worker was awaiting the therapist's report after mother's final session. Because mother withdrew her release of information, the social worker was unable to obtain information regarding mother's medications or her psychiatry appointments.

Mother's visits were still supervised. It was reported that, in recent weeks, there had been a noticeable shift in mother's emotional and behavioral presentation. Her increasing paranoia and emotional volatility began to affect the quality of her interactions with the minor and her fluctuations in mood and behavior impacted her ability to remain fully engaged with him. The visitation facilitator reported the minor recently began

---

[2] Erskine White was apparently an individual known to mother but not related to the minor or connected in any way to the dependency case.

crying inconsolably during visits, something the facilitator attributed to the minor sensing mother's inconsistent emotional state.  During visits, mother tended to display extremes in her behaviors, going from animated, loud, and erratic to withdrawn and quiet.  During a visit on May 1, 2025, mother initially appeared upbeat and engaged but, when asked to sign a release of information, she became agitated, paranoid, and emotionally distressed.  While mother reportedly made some progress, the visits overall remained inconsistent.

The minor (then 18 months old) was doing well and was described as a very calm, happy baby.  However, his foster mother noted behavioral changes after visits with mother, including clinginess, not wanting to leave the foster mother's arms, not wanting to be put down to eat or sleep, and waking up crying several times throughout the night and needing to be consoled and rocked back to sleep.  In May 2025, mother reportedly called the police more than once and requested a "Well Check" at the foster home claiming the minor was crying during a supervised visit and had blood in his stool (despite the social worker observing that the minor did not have a bowel movement at all during the visit).  Mother also contacted the police to go to the foster home because mother believed the minor was being "sex trafficked," as he was not present for the visit that day.  In reality, the foster mother and the minor were on a vacation that had been prearranged months prior and cleared by the Department and about which mother knew and had already made up for the time the minor was gone.

The Department concluded that, while mother expressed a strong desire to reunify with the minor, she had not taken the necessary steps toward reunification, despite being given adequate time and opportunity:  she had not consistently engaged in therapeutic services; she remained noncompliant with her medication regimen; and she failed to demonstrate she could prioritize the minor's developmental and emotional needs.  Her ongoing denial of her mental health needs and lack of insight into how they impacted her parenting ability continued to pose a substantial risk to the minor.

On June 2, 2025 and June 3, 2025, mother filed separate but substantively identical section 388 petitions seeking to modify the juvenile court's February 3, 2025 order continuing mother's supervised visits and continuing the minor in out-of-home placement. On June 6, 2025, the court summarily denied both petitions without a hearing, finding the petitions failed to demonstrate changed circumstances or that mother's requested change was in the minor's best interest.

Mother timely appealed the juvenile court's orders denying her section 388 petitions.

DISCUSSION

I

*Section 388 Petition*

Mother contends the juvenile court abused its discretion when it summarily denied her section 388 petitions without a hearing. She claims the court failed to consider the many exhibits attached in support of her petitions demonstrating her completion of one-on-one therapy and parenting classes, her attendance at mental health therapy sessions and medication appointments, her safe home and provision of supplies to care for the minor, and her successful visitation with the minor. She further claims the court failed to liberally construe the petition in favor of its sufficiency as required by California Rules of Court,[3] rule 5.570(a). Finally, mother claims that failure to allow her an evidentiary hearing violated her right to freedom of speech and due process under the First and Fourteenth Amendments to the United States Constitution. Mother's claims lack merit.

To petition to modify a juvenile court order under section 388, a party must factually allege changed circumstances or new evidence to justify the requested order, and that the requested order would serve the minor's best interests. (*In re Daijah T.*

---

[3] Further rule references are to the California Rules of Court.

6

(2000) 83 Cal.App.4th 666, 672.)  The petitioner has the burden of proof on both points by a preponderance of the evidence.  (Rule 5.570(h)(1)(D).)

In deciding whether a parent has met his or her burden under section 388, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the continuation of the problem; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents or caretakers.  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229.)  However, this list is not exhaustive.  (*Ibid.*)

The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his "hard work and efforts to reunify."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)  "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.)  The juvenile court must liberally construe the petition in favor of its sufficiency.  (Rule 5.570(a).)  Nonetheless, if the juvenile court finds that even so construed the petition fails to make a prima facie case as to either or both tests under section 388, the court may deny the petition without an evidentiary hearing.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see rule 5.570(d).)  We review the summary denial of a section 388 petition for abuse of discretion.  (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Here, regarding evidence of a change in mother's circumstances, mother's petitions both alleged that she had graduated from one-on-one parent-child therapy, was doing well at visits, "attended mental health therapy [and] medication at Kaiser" from

7

May 2024 to May 2025, had a safe home and all supplies to care for the minor, and completed group and individual parenting classes, as demonstrated by the supporting documents attached to her petitions. Those supporting documents included a letter from mother to the court, a certificate of completion of a parent-child therapy program on May 29, 2025, certificates of completion of 36 hours of parenting classes from May to September 2024, pictures of mother's home and childcare supplies, and a summary of contacts with Kaiser Permanente from May 2024 to May 2025. The juvenile court denied mother's petitions on the grounds that she had not demonstrated changed circumstances.

Mother claims the court failed to consider the numerous supporting documents and liberally construe the petition in favor of its sufficiency. Yet all of the supporting documents, many of which provided no substantive evidence of mother's progress, were before the court and, even liberally construed, showed mother's circumstances were far from changed. So, too, do the Department's reports, which were also before the court. As of June 2025, mother was still living in a room in someone else's house and had no access to the kitchen or the laundry room. She completed parenting classes but struggled to articulate an understanding of the minor's needs. Her visits were still supervised and she needed constant guidance and reinforcement during visits with the minor. Mother had recently exhibited a noticeable shift emotionally and behaviorally, with increasing paranoia, emotional volatility, and fluctuations in mood and behavior. She called law enforcement more than once on the foster mother claiming the minor cried and had blood in his stool during a visit, a claim that proved to be false. She also contacted law enforcement about the foster mother claiming the minor was being sex trafficked, another claim proven to be wildly fictitious, as the foster mother and the minor were on a preauthorized vacation about which mother already knew. The court considered the Department's reports along with mother's petitions. Based on the evidence and

information before it, the court found mother failed to make a prima facie case that her circumstances were changed. The court properly exercised its discretion.

Regarding whether her request was in the minor's best interest, mother's petitions argued the minor should be "with his biological mother" and "have an opportunity to reunify with [her]." The Department's reports, which were before the court, belie mother's claim that this would be in the minor's best interest. Despite completing parenting classes, mother still struggled to demonstrate she understood the minor's behaviors and cues. She needed constant guidance and reinforcement during visits, which were still supervised. Due to mother's increasing paranoia and emotional volatility and her fluctuations in mood and behavior, the minor became inconsolable during visits. Following those visits, the minor did not want to be apart from the foster mother or separate from her to eat or sleep. He woke up crying several times throughout the night, needing to be consoled in order to get back to sleep.

Meanwhile, the minor was otherwise a happy baby who was doing well with his foster mother, with whom he had been placed for 18 months. When, as here, a child is under the age of three at the time of initial removal, reunification services for that child "shall be provided for a period of 6 months … but no longer than 12 months from the date the child entered foster care ...." (§ 361.5, subd. (a)(1)(B).) The minor was removed as a newborn in December 2023. The court ordered services for mother in February 2024. Although she received well over 12 months of services by June 2025 and completed some as previously discussed, she had not taken all necessary steps to reunify by consistently engaging in therapeutic services, being compliant with her medication regimen, or demonstrating she could prioritize the minor's developmental and emotional needs. She continued to deny her mental health needs and lacked insight into how her mental health issues impacted her ability to adequately and safely parent the minor.

Mother failed to sufficiently allege facts showing her circumstances were changed or her request was in the minor's best interest. Her contention that it was in the minor's

9

best interest simply because he needed to be with his biological mother is insufficient. Thus, the allegations in her petitions did not meet either prong of section 388 and the juvenile court acted well within its discretion in summarily denying mother's section 388 petitions. In light of this conclusion, we reject mother's claim that failure to allow her an evidentiary hearing violated her right to freedom of speech and due process under the First and Fourteenth Amendments to the United States Constitution. Given that mother did not make a prima facie showing on her section 388 petitions, there was no due process violation in denying those petitions without an evidentiary hearing. (See *In re Heather P.* (1989) 209 Cal.App.3d 886, 891; see also *In re Jeremy W.*, *supra*, 3 Cal.App.4th at pp. 1413-1414.)

## II

## *ICWA*

Mother contends the juvenile court erred in finding the Department undertook a proper ICWA inquiry of the maternal extended family members. As we explain, the claim is premature.

*ICWA Background*

The transfer documentation to Sacramento County stated the Solano County juvenile court made a finding on November 4, 2024, that the "ICWA does not apply." The Solano County Department's final status review report stated all known relatives and nonrelated extended family members were reflected on the ICWA compliance report filed on February 29, 2024, and no additional relatives or new relative information had come to light since that time. That report detailed all ICWA inquiry efforts, including inquiry of mother on numerous occasions beginning in December 2023, at which time mother reported no known Indian ancestry.[4] Thereafter, despite numerous inquiry

---

[4] The identity of the minor's biological father was unknown.

10

attempts over the next year, mother refused to provide information regarding her family. The report noted that, in mother's other dependency case regarding the minor's half siblings in Yolo County, mother claimed Navajo ancestry through the maternal grandmother. Status reports in that case stated noticing was completed and a finding made that the ICWA did not apply. Other than her name, no other information was provided regarding the maternal grandmother. The report noted the Solano County Department identified the name and telephone number for the maternal grandfather. However, the telephone number was no longer in service. The report also noted the inquiry efforts included interviews with mother (there was no known identifying information about father), contact with the Navajo Nation and the Colorado River Indian Tribes, and referral to Victor Support Services, an outside agency for family finding services.

The Sacramento County Department's transfer-in report noted the Solano County juvenile court's finding that the ICWA did not apply. The Department's ICWA compliance report reiterated the Solano County Department's repeated efforts to obtain information from mother and detailed the Department's own efforts to comply with the ICWA's requirements of further inquiry. At the November 18, 2024 transfer-in hearing, mother informed the juvenile court that her uncle (the maternal great-uncle) claimed possible Indian ancestry but provided no additional information. Mother believed she might have Navajo ancestry but did not know anything more. She also believed she knew the maternal great-uncle's name, but she was not sure how he was related to the maternal grandfather and she had not spoken with him in years. Mother reported she had recently re-established contact with the maternal grandfather, who lived in Sacramento or Elk Grove, and stated she would obtain the necessary information from him.

In late November 2024, mother reported she had not been able to connect with either the maternal grandfather or the maternal great-uncle and could not provide the social worker with contact information for either individual. In early December 2024, the

11

social worker obtained addresses for the maternal grandparents and sent letters to both individuals inquiring about possible Indian ancestry.

The Department's ICWA compliance report noted mother's name and birth date, the maternal grandmother's name and address, and the maternal grandfather's name and address. Utilizing the Bureau of Indian Affairs and the Department of Social Services for assistance in identifying tribal names and contact information, the Department identified and contacted the Navajo Nation and the Colorado River Indian Tribes and provided each with a letter and the minor's family tree. Both tribes acknowledged receipt of the information. Based on its inquiry efforts as described, and the Solano County juvenile court's earlier finding, the Department recommended the juvenile court find there was no reason to believe or know the minor was an Indian child and therefore the ICWA did not apply.

At the ICWA compliance hearing on December 16, 2024, the juvenile court considered, and all counsel submitted on, the documents transferred from Solano County and the reports submitted by the Department. The Department informed the court that it was still awaiting responses from maternal relatives to its ICWA inquiries and requested a continuance of the ICWA compliance hearing. The court accepted the transfer, adjudged the then 12-month-old minor a dependent of the juvenile court, adopted the Department's recommended findings and orders, and set a further ICWA compliance hearing.

The Department's January 2025 ICWA compliance report stated the ICWA does not apply. The social worker reportedly met with mother on January 8, 2025, and asked whether mother had been able to contact the maternal grandfather or the maternal great-uncle to obtain ancestry information. Mother reported she was not on speaking terms with her family and had no contact with them. She was unable to provide the social worker with contact information for any relative. The social worker noted having received no communication from the maternal grandparents regarding her earlier inquiry.

12

The report reiterated the social worker's communications previously sent to the Navajo Nation and the Colorado River Indian Tribes and noted both tribes had certified receipt but had yet to respond to the social worker's detailed telephone messages.

On February 3, 2025, the juvenile court adopted the Department's proposed findings and orders and, at the Department's request, continued the ICWA compliance hearing for two months for further inquiry.

The April 2025 progress report stated the social worker left detailed voicemail messages for the Navajo Nation and the Colorado River Indian Tribes on February 6, 2025 and March 12, 2025, but had not received return calls from either tribe.

In its May 2025 permanency review report, the Department recommended the juvenile court terminate mother's reunification services and set the matter for a section 366.26 hearing. The report stated the ICWA does not apply. Mother was refusing contact with the Department, directing that all contact go through her "representative, Erskine White."

At the 18-month review hearing on June 2, 2025, White represented himself to the juvenile court as the minor's biological maternal great-great-uncle. When the court asked White if he had any Native American ancestry, he responded, "We -- we believe we do," stating his great-great-grandmother claimed to be Choctaw Indian. White identified the great-great-grandmother and stated she was living in Portland, Oregon when she died in 1964.

*Applicable Law*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who

13

"is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) "Under ICWA's state analogue statutes [the California Indian Child Welfare Act] (Cal-ICWA ...), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquiry whether a child … is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125; § 224.2, subd. (a); rule 5.481(a).)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

On appeal, we review ICWA findings and orders for substantial evidence. (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) A finding that the ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

14

*Analysis*

Mother claims the juvenile court's findings are not supported by the evidence because the Department's ICWA inquiry was inadequate in that it had access to mother's prior dependency records, to the maternal step-grandmother, and to the father of mother's older children, as well as names and contact information for the maternal grandparents, but it failed to contact those individuals prior to sending the ICWA-030 notice form to the relevant tribes in January 2024. She further claims the Department made no attempt to contact the maternal relatives regarding possible Indian heritage prior to the court's November 4, 2024 finding that the ICWA did not apply.

Mother's claim is premature. At the time the matter was transferred from Solano County to Sacramento County, the Department reviewed the Solano County juvenile court's ICWA findings, as well as the Solano County Department's ICWA inquiry efforts. Notwithstanding the Solano County juvenile court's finding that ICWA did not apply, and the same finding in mother's other dependency case in Yolo County, the Department conducted its own further inquiry, including conversations with mother, which revealed only a possible Navajo affiliation claimed by the maternal great-uncle with whom mother was not speaking and for whom she could provide no contact information. The Department independently obtained addresses for the maternal grandparents and, in December 2024, sent ICWA inquiry letters to them. They never responded. The Department also identified the Navajo Nation and the Colorado River Indian Tribes and provided each with information of the minor's known family members, followed by a letter with an updated family tree. The tribes acknowledged receipt of the information but provided no further response regarding the minor's potential status as an Indian child. Based on its own inquiry efforts, and on the Solano County juvenile court's earlier finding, and in spite of mother's refusal to cooperate or provide any additional information, the Department recommended the juvenile court find there was no reason to believe the minor was an Indian child and therefore the ICWA did not apply.

15

However, at hearings on December 16, 2024 and February 3, 2025, the juvenile court adopted the Department's recommended findings and orders *but set continued ICWA compliance hearings for further inquiry* based on the Department's representations that it was still awaiting responses from the maternal relatives and it had not yet heard back from the tribes. At the 18-month review hearing on June 2, 2025, the final hearing before the filing of mother's appeal, mother's "representative, Erskine White" claimed he was the minor's biological great-great-uncle and that he had possible Choctaw ancestry. Given that information, the court set the matter for a contested 18-month review hearing *and made no new ICWA finding*.

As of the filing of mother's appeal, the juvenile court ordered continued ICWA compliance hearings for further inquiry. That is, ICWA compliance is ongoing and the court has yet to make a *final* ICWA finding of inapplicability as mother asserts. Any ICWA inquiry and notice compliance issues are thus not yet ripe for review and mother's claim of ICWA error is premature. " 'Ripeness' refers to the requirements of a current controversy." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59.) An issue is not ripe for review unless and until it is "sufficiently concrete to allow judicial resolution even in the absence of a precise factual context." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170; see *id.* at pp. 170-172.) As this court explained in *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, if the juvenile court did not yet make a final ICWA ruling at or before the challenged hearing as to whether the ICWA applies to the proceeding, a parent's challenge is premature. (*J.J.*, at p. 461.) Any remarks we would make now on the adequacy of the ICWA compliance would be advisory. (See *People v. Buza* (2018) 4 Cal.5th 658, 693 ["We ... abide by ... a ' "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more" ' "].) Mother's ICWA claim is dismissed as premature.

16

# DISPOSITION

The juvenile court's orders are affirmed.

        /s/
        BOULWARE EURIE, J.

We concur:

/s/
HULL, Acting P. J.

/s/
RENNER, J.

17